UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NEW YORK STATE RESTAURANT
ASSOCIATION,

                             *Plaintiff,*

       v.

NEW YORK CITY BOARD OF HEALTH, *ET AL.*,

                            *Defendants.*

**No. 08 Civ. 1000 (RJH)**

---

## REPLY MEMORANDUM IN SUPPORT OF MOTION
## FOR PRELIMINARY INJUNCTION AND DECLARATORY RELIEF

ARNOLD & PORTER LLP

399 Park Avenue
New York, New York 10022
(212) 715-1000

*Counsel for Plaintiff, New York State
Restaurant Association*

February 14, 2008

# TABLE OF CONTENTS

*Page*

I. THE NATIONAL LABELING AND EDUCATION ACT PREEMPTS REGULATION 81.50....................................................................................................................1

    A. The Distinction Between "Voluntary" and "Involuntary" Statements Is Not Justifiable........................................................................1

        1. The City's Position Would Turn Preemption On Its Head..............1

        2. The City's Theory Cannot Be Reconciled With Section 343(r) and Its Implementing Regulations .........................................3

    B. The Text and Structure of Section 343-1 Compel Preemption....................6

        1. Section 343-1(a)(4) is Does Not "Expressly Preserve" All State Regulatory Power over Nutrition Labeling in Restaurants ..............................................................................7

        2. Section 343-1(a)(5) Would Be Rendered Meaningless By the City's Reading.............................................................................8

        3. Section 343-1(b) Creates the Process for Resolving the Policy Conflict Presented in this Case............................................9

    C. The City's Amici Misuse Legislative History and Rely on Agency Statements that are Entitled to No Deference ............................................11

II. REGULATION 81.50 VIOLATES THE FIRST AMENDMENT RIGHTS OF PLAINTIFF'S MEMBERS ........................................................................................14

    A. Regulation 81.50 Compels Speech ...........................................................14

        1. The Regulation Requires Much More than Simple Commercial Disclosure................................................................15

        2. The First Amendment Protects Against Compelled Statements of Facts as Well as Opinions and Points of View ..........................................................................................16

    B. "Reasonableness" Review Is the Wrong Standard .....................................18

        1. Reasonableness Scrutiny for "Disclosure" Requirements Would Clash With Supreme Court First Amendment Jurisprudence .........................................................................18

        2. Disclosure Requirements Routinely Trigger Heightened First Amendment Scrutiny............................................................21

        3. Sorrell and Cases from Other Circuits Do Not Support "Reasonableness" Review .........................................................23

*Page*

C.  Regulation 81.50 Cannot Survive Review Under Central Hudson ...........25

    1.  Regulation 81.50 Does Not Advance The City's Asserted Interest In Curbing Obesity in a "Direct and Material Way" ........26

    2.  Regulation 81.50's Infringement On Speech Is More Extensive Than Necessary To Serve The City's Asserted Interest.........................................................................................29

CONCLUSION..............................................................................................31

# TABLE OF AUTHORITIES

## CASES

**Page(s)**

*44 Liquormart, Inc. v. Rhode Island,*
  517 U.S. 484 (1996)...............................................................................21, 28, 29

*Barnbart v. Sigmon Coal Co.,*
  534 U.S. 438 (2002).......................................................................................11, 12

*Baxter Healthcare Corp. v. Denton,*
  15 Cal. Rptr. 3d 430 (Cal. Ct. App. 2004)..............................................22

*Brown v. Socialist Workers '74 Campaign Committee,*
  459 U.S. 87 (1982)................................................................................................21

*Buckley v. American Constitutional Law Foundation,*
  525 U.S. 182 (1999)..............................................................................................21

*Burson v. Freeman,*
  504 U.S. 191 (1992)......................................................................................28, 29

*Central Hudson Gas & Electric Corp. v. Public Service Commission of
  New York,* 447 U.S. 557 (1980) ..................................................... passim

*Chevron U.S.A. v. National Resources Defense Council,*
  467 U.S. 837 (1984).......................................................................................12, 14

*Christensen v. Harris County,*
  529 U.S. 576 (2000)............................................................................................13

*Edenfield v. Fane,*
  507 U.S. 761 (1993)......................................................................................20, 26

*Entertainment Software Association v. Blagojevich,*
  469 F.3d 641 (7th Cir. 2006) ........................................................................24

*Environmental Defense Center v. EPA,*
  344 F.3d 832 (9th Cir. 2003) ........................................................................25

*European Connections & Tours v. Gonzalez,*
  480 F. Supp. 2d 1355 (N.D. Ga. 2007)...................................................25

*Florida Bar v. Went For It, Inc.,*
  515 U.S. 618 (1995).............................................................................................28

**Page(s)**

*Glickman v. Wileman Brothers & Elliott, Inc.,*
    521 U.S. 457 (1997)..................................................................................25

*Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston,*
    515 U.S. 557 (1995)............................................................................16, 17

*Ibanez v. Florida Dept. of Bus & Prof. Reg. of Accountancy,*
    512 U.S. 136 (1994)..................................................................................28

*International Dairy Foods Association v. Amestoy,*
    92 F.3d 67 (2d Cir. 1996)..........................................................................17

*Johanns v. Livestock Marketing Association,*
    544 U.S. 550 (2005)............................................................................17, 20

*Lorillard Tobacco Co. v. Reilly,*
    533 U.S. 525 (2001)..........................................................21, 22, 26, 28, 29

*Marcus v. FTC,*
    354 F.2d 85 (2d Cir. 1965)........................................................................21

*McConnell v. FEC,*
    251 F.Supp.2d 176 (D.D.C.), *aff'd in part, rev'd in part,*
    540 U.S. 93 (2003)....................................................................................22

*McIntyre v. Ohio Elections Committee,*
    514 U.S. 334 (1995)..................................................................................21

*Meese v. Keene,*
    481 U.S. 465 (1987)..................................................................................19

*New York State Restaurant Association v. New York City Board of Health,*
    509 F. Supp. 2d 351 (S.D.N.Y. 2007)........................................................10

*National Electric Manufacturers Association v. Sorrell,*
    272 F.3d 104 (2d Cir. 2001)..........................................................14, 18, 22, 23

*Nutritional Health Alliance v. Shalala,*
    144 F.3d 220 (2d Cir. 1998)......................................................................22

*Pacific Gas & Electric Co. v. Public Utilities Commission of California,*
    475 U.S. 1 (1986)......................................................................................24

*Pearson v. Shalala,*
    164 F.3d 650 (D.C. Cir. 1999)..................................................................22

iv

**Page(s)**

*Pelman v. McDonalds,*
    237 F. Supp. 2d 512 (S.D.N.Y. 2003)................................................................7

*Pharmaceutical Care Management Associate v. Rowe,*
    429 F.3d 294 (1st Cir. 2005)................................................................24

*PruneYard Shopping Center v. Robins,*
    447 U.S. 74 (1980)................................................................19

*R.A.V. v. St. Paul,*
    505 U.S. 377 (1992)................................................................21

*Riley v. National Federation of the Blind of N.C., Inc.,*
    487 U.S. 781 (1988)................................................................16, 17

*Rubin v. Coors Brewing Co.,*
    514 U.S. 476 (1995)................................................................22, 28

*Talley v. California,*
    362 U.S. 60 (1960)................................................................21

*United States v. Mead Corp.,*
    533 U.S. 218 (2001)................................................................12, 14

*United States v. United Foods, Inc.,*
    533 U.S. 404 (2001)................................................................14, 17, 18, 19, 20

*Wegman's Food Markets, Inc. v. New York,*
    76 A.D.2d 95 (N.Y. App. Div. 1980)................................................................21

*Whitaker v. Thompson,*
    353 F.3d 947 (D.C. Cir. 2004)................................................................22

*Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio,*
    471 U.S. 626 (1985)................................................................14, 18, 19, 20, 24

## STATUTES AND REGULATIONS

2 U.S.C. § 434 ................................................................22

15 U.S.C. §§ 68-68*j* ................................................................21

15 U.S.C. § 78*l*................................................................21

15 U.S.C. § 1012................................................................7

**Page(s)**

15 U.S.C. § 1333 ................................................................................22

21 U.S.C. § 343 .......................................................................... passim

21 U.S.C. § 343-1 ....................................................................... passim

27 U.S.C. § 205 ................................................................................22

33 U.S.C. § 1318 ..............................................................................22

42 U.S.C. § 11023 ............................................................................22

Nutrition Labeling and Education Act § 3, Pub. L. 101-535, 106 Stat. 4501 (1990) ..........3

21 C.F.R. § 101.9 .............................................................4, 5, 6, 13

21 C.F.R. § 101.10 ...........................................................................13

21 C.F.R. § 101.13 ..................................................................2, 3, 4, 5, 6

21 C.F.R. § 101.36 .............................................................................4

21 C.F.R. § 101.61 .............................................................................2

21 C.F.R. § 202.1 ..............................................................................21

29 C.F.R. § 1910.1200 ......................................................................22

Cal. Health & Safety Code § 25249.6 ................................................22

N.Y. Agri. & Mkts. § 214-h .............................................................21

N.Y. E.C.L. § 33-0707 ......................................................................22

24 R.C.N.Y. Health Code § 81.50 (2008) ..................................... passim

## OTHER LEGISLATIVE AND ADMINISTRATIVE MATERIALS

56 Fed. Reg. 60528 (Nov. 27, 1991) .................................................11

58 Fed. Reg. 44063 (Aug. 18, 1993) ...................................................5

136 Cong. Rec. H12951-02 (Oct. 26, 1990) .......................................9

H.R. Rep. No. 101-538 (1990), 1990 U.S.C.C.A.N. 3349 ..................9

## OTHER AUTHORITIES

**Page(s)**

Patrick Basham and John C. Luik, *Nutrition Labeling on Menu Boards and Menus: A Recipe for Failure*, Washington Legal Foundation Critical Legal Issues, Working Paper Series # 154 (December 2007) (reproduced at Supp. App. C) ...................................................................16

The Keystone Center, *The Keystone Forum on Away-From-Home Foods: Opportunities for Preventing Weight Gain and Obesity*, Final Report (May 2006).........................................................................................13, 29

Ray Rivera, *Battle Over Calorie-Posting May Widen,* N.Y. TIMES (September 13, 2007) at B3 (reproduced at Supp. App. A)...................................15

U.S. Food & Drug Administration, "Calories Count: Report of the Working Group on Obesity" (March 12, 2004)......................................................13

U.S. Food & Drug Administration, "FDA Talk Paper T96-52" (July 30, 1996) ........................................................................................13

U.S. Department of Health and Human Services, U.S. Public Health Service, Federal Food and Drug Administration, *Food Labeling: Questions and Answers, Volume II,* "A Guide for Restaurants and Other Retail Establishments" (originally published August 1995) (revised February 1996) ........................................................................13

I.    **THE NATIONAL LABELING AND EDUCATION ACT PREEMPTS REGULATION 81.50**

A.    **The Distinction Between "Voluntary" and "Involuntary" Statements Is Not Justifiable**

The crux of the city's argument is that a "claim" under § 343(r) is limited to "voluntary" statements about the nutrient levels in food.  Under this theory, restaurants are not making a "claim" within the meaning of § 343(r) once Regulation 81.50 requires them to post calorie information on the menus and menu boards at their New York City locations.  We do not believe that the city and its *amici* have justified this theory.

1.    **The City's Position Would Turn Preemption On Its Head**

To begin, the city's voluntary/mandatory distinction would turn the concept of preemption on its head.  The fundamental purpose of a preemption statute is to provide for federal law to displace state law.  But the city's position would make the operation of the federal preemption statute at issue here depend on the substance of individual state and local laws.  National restaurant chains that voluntarily provide nutrition information to their customers today—before Regulation 81.50 takes effect—enjoy the uniformity granted by federal preemption.  But under the city's theory, on March 31, a change in local law will vitiate the preemptive power of the federal statute.  Conduct that today is protected by the national uniformity required by the preemption statute, will on that day lose its federal protection as a result of a change in local law, according to the city.  This runs completely counter to the purpose of preemption, which is to ensure that federal law *displaces* state law covering a particular activity to promote national uniformity and predictability in interstate commerce.  Such a federal scheme cannot possibly work if it operates only in the absence of state or local law.

If the city's reading of the statute were correct, the consequences would be far reaching. For example, consider a local regulation requiring restaurants to identify, on the menu, all "low sodium" items and all items that "contain 100 calories" or fewer—the very examples used in the definition of express nutrient "claims" in section 101.13(b)(1) of the FDA's regulations. According to the city's reasoning, once these statements are "mandated" by the city (and are no longer voluntary) they are not "claims" and can be regulated at will by the city. Some localities might require prominent disclosures of calories, others might demand disclosure of fat content, or sodium content, or other nutrients deemed healthy or dangerous. None of these required disclosures would be part of the nutrition information panel and so would not be preempted by section 343-1(a)(4). Under the city's reasoning, none of these local vagaries would be "claims" either (because they would be mandated), so the local laws would not be preempted by section 343-1(a)(5). And once the door were thus opened to state regulation, national uniformity would be lost: each state or locality would be free to mandate disclosure of "low sodium" or "low fat" or "high fiber" using whatever definition it saw fit. Such mandatory disclosures would not be "claims," and would not be subject to the FDA's regulatory regime.[1] Federal uniformity would be lost.

Furthermore, the next logical step is inescapable: since these are not "claims" and

---

[1] *Amici* led by Public Citizen contend that such products would be "misbranded" under section 343(a). That is not accurate. For example, the federal regulations require a "low sodium" food to contain fewer than 140 grams of sodium per serving. 21 C.F.R. 101.61(b)(4)(i)(A). But a New York City law might require disclosure of "high sodium" foods containing more than 300 grams per serving, or might require labeling of "low sodium" of foods with fewer than 35 grams per serving. Foods carrying such labels would not be "misbranded" under any FDA regulation, but the city law would not be "identical" to the FDA's requirements.

do not appear in the nutrition label, they could be required not just on restaurant menus, but on packaged food as well. In this regard, the statutory divide is not between "packaged food" and "restaurant food," but between the nutrition information panel (regulated in subsection (q)) and other labeling (regulated in subsection (r)). Any interpretation of subsection (r) that makes sense for restaurants must also make sense for the labeling of packaged food outside the nutrition information fact panel.

### 2. The City's Theory Cannot Be Reconciled With Section 343(r) and Its Implementing Regulations

Both subsection (r) itself and NLEA § 3(b)(1)(A)(iii) refer broadly to "claims" and "statements" of any kind and make no distinctions as to whether the "claims" or "statements" are voluntary or mandated by state or local law. *See* Opening Mem. p. 24.

The city and its *amici* have not cited any part of subsection (r) that mentions "voluntary," or "involuntary" or "mandated" claims. The city tries to rely on the unnumbered portion of section 343(r)(1) (the "floating" provision), but that provision, read in connection with its implementing regulation (21 C.F.R. § 101.13(c)), undermines the city's case. Section 343(r)(1) provides that "[a] statement of the type required by paragraph (q) of this section . . . that appears as part of the nutrition information required or permitted by such paragraph is not a claim which is subject to this paragraph." The city concedes that a statement of calories on a menu or menu board is a "statement of the type required by [paragraph (q)]." Def. Mem. p. 11. Thus, according to the "floating" provision, a statement of calories is not a "claim" if it "appears *as part of* the nutrition information required or permitted by [subsection (q)]." 21 U.S.C. § 343(r)(1) (emphasis supplied).

The city argues that calorie statements required by Regulation 81.50 come within the "floating" provision on the theory that subsection (q) "permits local governments to mandate that restaurants disclose nutrition information," so that mandatory labeling is "permitted by" subsection (q) and therefore "not a claim" under the "floating" statutory provision. Def. Mem. p. 11. The city mis-describes subsection (q). Subsection (q) concerns itself exclusively with nutrition information panels required by federal law. It does not "permit" or "not permit" (or indeed regulate in any way) any other disclosures. The reason the phrase "required or permitted" appears in the "floating" provision is that subsection (q) requires nutrition fact panels to include certain information (*e.g.*, calories) and permits nutrition fact panels to include other information (*e.g.*, potassium). Subsection (q) does not "permit" state regulation or speak in any way to state regulation.

In addition, the city ignores the phrase "appears as part of" in the statutory text. Since a statement of the amount of calories on a menu does not "*appear as part of* the nutrition information required or permitted" by subsection (q), it is a "claim." The applicable regulation (ignored by the city and its *amici*) makes this explicit. Section 101.13(c) of the regulations provides:

> Information that is required [*e.g.*, calories] or permitted by § 101.9 [mandatory nutrition labeling requirements for food] or § 101.36 [mandatory labeling requirements for dietary supplements], as applicable, to be declared in nutrition labeling, *__and that appears as part of the nutrition label__*, is not a nutrient content claim and is not subject to the requirements of this section. *__If such information is declared elsewhere in the label or in labeling, it is a nutrient content claim and is subject to the requirements for nutrient content claims.__*

21 CFR § 101.13(c) (emphasis supplied). The regulation—promulgated to implement the "floating" portion of subsection (r)—provides that a statement of calories (or anything

- 4 -

else required or permitted by the statute) is a claim unless it "appears as part of the nutrition label." For the FDA's illustration of the "nutrition label," see 21 C.F.R. § 101.9(d)(12). Nutrition statements in restaurants do not appear on the nutrition label; they appear elsewhere in label or labeling. Therefore section 101.13(c) requires that such statements comply with FDA regulations for nutrient content claims. Section 101.9(j)(2) is to the same effect.[2]

We also showed in our opening brief the voluntary/mandatory distinction conflicts with the FDA's regulations that define "claims." The regulations define an "express nutrient content claim" to include *any* statement about the amount of a nutrient. *See* Opening Mem. p. 24-25. Like the statute, the regulatory definition applies broadly to "any direct statement" and "any claim." It does not limit the definition of "claim" to voluntary statements or conversely contain an exception for statements mandated by state law. The city and its *amici* do not contest this showing. Notably, the statute gave the FDA plenary authority to define a "claim," and the agency might have created a voluntary/mandatory distinction in the term. It did not. Rather, the FDA chose to define a claim comprehensively to include "**any** direct statement about the level (or range) of a nutrient in the food, *e.g.*, 'low sodium' or 'contains 100 calories.'" 21 C.F.R. § 101.13(b)(1) (emphasis supplied). The city and its *amici* ignore these regulations, even

---

[2] This section exempts restaurant food from the FDA regulatory regime "provided that the food bears no nutrition claims or other nutrition information in any context on the label or in labeling or advertising. Claims or other nutrition information subject the food to the provisions of this section." 21 C.F.R. § 101.9(j)(2). The city argues that section 101.9(j)(2) was promulgated under subsection (q), not subsection (r). Def. Mem. p. 10 n. 7. But the FDA's notice of final rulemaking cites subsection (r)(5)(B) as authority for promulgation of section 101.9(j)(2). 58 Fed. Reg. 44063, 44070 (Aug. 18, 1993).

though they have the force of law.[3]

Amici cite FDA statements in the agency's notices of rulemaking that refer to the word "voluntary" when discussing claims governed by subsection (r). Since subsection (r) does not mandate that food providers publish anything, it is not surprising that claims governed by subsection (r) would be described as voluntary. But the word is used in a descriptive sense, not a restrictive one.[4] Whether a statement of the level of a nutrient content is "voluntary" or "compelled," the nature of the statements, e.g., "low sodium," or "contains 100 calories," is the same. The statement "low sodium" would not lose its status as a nutrient content claim if the city of New York passed a law requiring publication of this information. It is would still be a statement of the level of sodium content and it would still meet the definition of an expressed nutrient content claim in the regulations. 21 C.F.R. § 101.13(b)(1).

## B.    The Text and Structure of Section 343-1 Compel Preemption

The city and its amici devote almost all of their discussion of express preemption to section 343-1(a)(4), which concerns nutrition panels. Of course, plaintiff has never claimed preemption under that provision. Rather it claims preemption under section 343-

---

[3] Moreover, in permitting certain statements on the nutrition information fact panel, section 101.9 does use the word "voluntary" in limited circumstances. 21 C.F.R. § 101.9(c)(1)(iii) (saturated fat), (c)(2)(iii) (polyunsaturated fat), (c)(2)(iv) (mono-unsaturated fat), (c)(5) (potassium), (c)(6)(i)(A) (soluble fiber), (c)(6)(i)(B) (insoluble fiber), (c)(6)(iii) (sugar alcohol), (c)(6)(iv) (other carbohydrates). In each instance, the word appears as "VOLUNTARY" in capital letters. In contrast, the word "voluntary" does not appear at all in the regulatory definitions of claims. See 21 C.F.R. § 101.13.

[4] The secondary articles cited by amici have little to offer compared to the statute and regulations. None of those articles argues for the proposition that FDA regulation of restaurants is limited to voluntary nutrition statements. Like the agency statements, the articles' references are merely descriptive, comparing the mandatory nutrition labels with claims, which are not mandated by the FDA regulations.

1(a)(5), which concerns claims.[5]  Subsection (r) and subsection 343-1(a)(5) must be read

to have meaning of their own.  And accepting the city's position that state and local

"mandates" convert statements from "claims" into "non-claims" would read section 343-

1(a)(5) out of existence.

     **1.**     **Section 343-1(a)(4) is Does Not "Expressly Preserve" All State Regulatory Power Over Nutrition Labeling in Restaurants**

     The city's analytical misstep here arises from its conception of the restaurant

exception in section 343-1(a)(4) as one that "expressly preserves" state power.  Def.

Mem. p. 5; *see also* Pub. Cit. Mem. p. 3.  Subsection (a)(4) does not expressly preserve

all state regulatory power over nutrition labeling in restaurants.  It is an exception to a

particular preemption provision.  It does not say that *no* preemption provision applies to

restaurants.  When Congress intends to reserve *all* regulatory power to the states, it does

so expressly.  To take one prominent example, the McCarran-Ferguson Act provides:

"The business of insurance, and every person engaged therein, shall be subject to the laws

of the several States which relate to the regulation or taxation of such business. . . .  No

Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by

any State for the purpose of regulating the business of insurance . . . ."  Act of Mar. 9,

1945, ch. 20, 59 Stat. 34 (codified at 15 U.S.C. § 1012).  The restaurant exception in

subsection (a)(4) is nothing like that.  It reflects Congress' decision not to apply a

particular subsection of one statute—here, subsection (q)—to restaurants and to provide

that state law is not preempted *by that subsection*.

---

[5] *Amici's* reliance on *Pelman v. McDonalds,* 237 F. Supp. 2d 512 (S.D.N.Y. 2003), is inapposite.  *Pelman* did not consider the effect of § 343-1(a)(5).

2.    **Section 343-1(a)(5) Would Be Rendered Meaningless By the City's Reading**

The difference between the exception in section 343-1(a)(4) [for all restaurants] and the exception in section 343-1(a)(5) [for four specified nutrients in restaurant foods] further confirms that Congress *did* intend to preempt state and local laws that conflicted with regulations governing nutrient content claims—with the four specified exceptions for statements concerning cholesterol, saturated fats, dietary fiber and nutrients that the FDA has determined cause disease. Any reading that permits state regulation of nutrient content claims of nutrients *in addition to* those four nutrients would render the exemption in subsection (a)(5) superfluous and therefore meaningless.

For this reason, the city's *amici* are wrong when they argue that reading section 343-1(a)(5) as preempting Regulation 81.50 would "effectively read the savings-clause for restaurants out of [§ 343-1(a)(4)]." Pub. Cit. Mem. p. 18. In fact, the converse is true. What meaning would section 343-1(a)(5) have if states could mandate "disclosure" of claims in any way they wished? Section 343-1(a)(5) allows states to regulate four specified categories of claims, while forbidding non-identical state regulation of other claims. But under the city's reading of subsection (a)(4), the four exemptions would be meaningless, and states would be entitled to compel whatever disclosures they wanted to about any nutrients they selected.

Of course, the city takes the view that preempting Regulation 81.50 would render the exception in subsection 343-1(a)(4) to be meaningless. But there are other ways to give meaning to both sections and to resolve whatever tensions there might be between them. We set those out in our opening memorandum. *See* Opening Mem. p. 26-28.

### 3. Section 343-1(b) Creates the Process for Resolving the Policy Conflict Presented in this Case

When Congress considered the NLEA, some advocates urged including restaurant foods in the scope of the statute's mandatory labeling provisions. Others argued that restaurant foods should not be covered at all because of special problems of providing nutrition information for restaurant foods, and because of the enormous burdens such a regime would impose on the restaurant industry and on interstate commerce. The House Report accompanying the NLEA states that restaurants received an exemption from the section 343(q) mandatory disclosures for practical reasons. *See* H.R. Rep. 101-538 (June 13, 1990) ("Where full labeling is impractical, the bill provides for an exemption or requires that the information be provided in a modified form. Under this approach, restaurants are exempt from the nutrition labeling requirements."). Several members expressed concern about imposing undue burdens on interstate commerce. *See, e.g.*, 136 Cong. Rec. H12951-02, H12954 (Oct. 26, 1990) (Statement of Rep. Madigan) ("it was decided that the fairest way to expect the food industry to support a nutrition labeling bill, was to give them some types of preemption of some burdensome State laws that interfered with their ability to do business in all 50 States.").

Under the city's theory, Congress resolved the conflict between those favoring greater disclosure and those concerned about an undue burden on commerce by agreeing with the restaurant industry to exempt restaurant foods from a mandatory labeling regime that would be uniform throughout the United States while at the same time subjecting the industry to a checkerboard of overlapping and conflicting mandatory regimes imposed by countless states and localities throughout the land. This "solution" ascribes an irrationality to congressional enactments that is not warranted and not supported by the

- 9 -

language of the statute itself.

This is not to say that Congress ignored the possible desirability of state or local regulation of restaurant foods. Congress' accommodation of this interest, however, was an institutional one. That is, Congress gave the federal regulatory agency charged with implementing the new statute the power to recognize the interests of the localities if warranted. Congress did so in two ways. First, Congress delegated the authority to define terms under the statute. In this case the most relevant term is "claim." As the Court has recognized, the FDA defined the term broadly. *New York State Rest. Assoc. v. New York City Bd. of Health*, 509 F. Supp. 2d 351, 360 (S.D.N.Y. 2007) ("*NYSRA I*").[6]

Second, Congress delegated the power to exempt particular state or local labeling regulations from the preemptive effect of the NLEA on a case-by-case basis. In other words, even after having defined "claims" as broadly as it did, the FDA has the power to accommodate state or local concerns. Thus, section 343-1(b) reads:

> Upon petition of a State or a political subdivision of a State, the Secretary may exempt from subsection (a) of [section 343-1], under such conditions as may be prescribed by regulation, any State or local requirement that—
>
> (1) would not cause any food to be in violation of any applicable requirement under Federal law,
>
> (2) would not unduly burden interstate commerce, and
>
> (3) is designed to address a particular need for information which need is not met by the requirements of the sections referred to in [section 343-1].

21 U.S.C. § 343-1(b).

---

[6] The city asserts that a mere statement of caloric values (as opposed to a statement using descriptive or qualitative terms) is not a "claim" within the meaning of the NLEA and regulations promulgated thereunder. Def. Mem. pp. 12-13. However, that issue was fully litigated and decided in the prior case and may not be relitigated in this case.

In this provision, Congress determined that if the statutory language, or the definitions promulgated thereunder, caused an unwarranted interference with state or local regulations concerning labeling, it was the FDA's responsibility, upon application of the locality, to examine the regulation, its necessity or utility, and also to weigh the burdens on interstate commerce and then to decide whether to permit the local regulation to proceed. By congressional mandate, this was a job for the FDA and not the courts.

In promulgating regulations under this provision, the FDA explained that section 343-1(b) reflects a compromise between federal uniformity and state efforts to regulate food labeling requirements:

> Congress reserved to the States the option of putting into effect composition or labeling requirements that differ from, and are more stringent than, Federal requirements providing that the States can demonstrate that the statutory criteria for exemption from preemption are met. The agency has included in the proposed regulations set forth below the matters that it considers necessary for a State to address to justify an exemption. A more liberal and less exacting interpretation of the types and depth of information required to sustain a State's burden of proof in a petition would undermine the congressional objective of national uniformity in certain aspects of food labeling.

56 Fed. Reg. 60528, 60531 (Nov. 27, 1991). The city has not applied for an exemption under this provision and offers no explanation of why not. Def. Mem. p. 11 n.8.

C.    **The City's *Amici* Misuse Legislative History and Rely on Agency Statements that are Entitled to No Deference**

*Amici* seek to avoid preemption by relying principally on floor statements and informal agency materials, rather than on the text of the statute and implementing regulations. The Supreme Court has noted the unreliability of floor statements as a source of legislative intent. "[Floor statements] cannot amend the clear and unambiguous

language of a statute," and there is "no reason to give greater weight to the views of two Senators than to the collective votes of both Houses, which are memorialized in the unambiguous statutory text." *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 457 (2002).

*Amici* also cite three informal FDA publications and one FDA-sponsored report in support of their argument that the NLEA does not preempt state laws mandating restaurants to disclose nutritional information about their foods. *Amici*'s reliance on these materials fails to reflect the critical distinction between regulations that operate with the "force of law"—namely regulations promulgated through a notice-and-comment rulemaking—and other agency-generated materials interpreting that agency's governing statute. Under the familiar standard laid out by the Supreme Court in *Chevron U.S.A. v. National Resources Defense Council*, "[i]f Congress has explicitly left a gap for [an] agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation." 467 U.S. 837, 843-44 (1984). Regulations promulgated pursuant to the Administrative Procedure Act's notice and comment requirements pursuant to such delegation have the force of law and are "binding in the courts unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute." *United States v. Mead Corp.*, 533 U.S. 218, 227 (2001). Agency interpretations in the form of opinion letters, policy statements, manuals, and enforcement guidelines do not warrant *Chevron* deference. *See Mead*, 533 U.S. at 234; *Christensen v. Harris County*, 529 U.S. 576, 587 (2000). Instead, any use of such materials requires evaluation of "the degree of the agency's care, its consistency, formality, and relative expertness" as well as the "persuasiveness of the agency's position." *Mead*, 533 U.S. at 228 (internal citations omitted).

The three FDA publications do not support defendant's position at all. These documents first state that restaurant food bearing no "claim" is exempt from federal labeling requirements. *See* FDA, Calories Count: Report of the Working Group on Obesity (2004) at 5 ("restaurants are not required to provide nutrition information unless a nutrient content or health claim is made") (cited at Pub. Cit. Mem. 10 n.6); FDA, A Guide for Restaurants and Other Retail Establishments (FDA Question/Answer Vol. II No. 31) ("restaurant foods that do not bear a claim" are exempt from the NLEA) (cited at Pub. Cit. Mem. 4, 16); FDA Talk Paper T96-52 (Section 101.10 applies when a restaurant makes a nutrient or health claim) (cited at Pub. Cit. Mem. 11). The statements quoted in the parentheticals above correctly reflect the FDA's regulation. 21 C.F.R. § 101.9(j)(2). And the materials go on to state—consistent with the regulation—that the exemption is *lost* when "a nutrient content claim or a health claim is made for" a restaurant menu item or meal. In such cases, restaurants are then subject to federal labeling and disclosure requirements. *Id.* Thus, these agency statements do not help the city.

*Amici* also rely heavily on a statement in the Keystone Group *Final Report* claiming that states are free to require menu labeling (Pub. Cit. Mem. 3, 14). But that statement is not a statement by the FDA at all. It was written by a nongovernmental group that did not purport to have studied the statute or the regulations and did not provide any reasoning for its statement.

In short, the materials by the FDA itself relied on by *amici* do not purport to conflict with the statute and the FDA regulations. (If they did conflict, the regulations would govern.) And the Keystone Group *Final Report* cannot overcome those regulations, promulgated after a lengthy notice-and-comment process pursuant to the authority

- 13 -

expressly delegated to the agency. *Chevron*, 467 U.S. at 844; *Mead*, 533 U.S. at 230.

## II.    REGULATION 81.50 VIOLATES THE FIRST AMENDMENT RIGHTS OF PLAINTIFF'S MEMBERS

The parties have suggested three possible standards under which Regulation 81.50 might be evaluated under the First Amendment:

1.    If Regulation 81.50 is subject to strict scrutiny of "compelled speech," (*see United States v. United Foods, Inc.*, 533 U.S. 405 (2001)), the city and its *amici* effectively concede that Regulation 81.50 cannot survive scrutiny.

2.    If the Regulation, instead, must be analyzed under the intermediate scrutiny standard ordinarily applied to commercial speech (*see Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557 (1980)), the city and *amici* do not concede the point, but they make no serious effort to defend the Regulation. *See* Def. Mem. p. 27 (addressing *Central Hudson* in the brief's last paragraph).

3.    That is why the city and *amici* argue so ardently that the case must be evaluated only under a "reasonably related" standard. *See Zauderer v. Office of Disciplinary Counsel of the Supreme Court of Ohio*, 471 U.S. 626 (1985); *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104 (2d Cir. 2001). However, for reasons described below, the "reasonably related" standard does not govern this case.

### A.    Regulation 81.50 Compels Speech

The city and its *amici* argue that compelled speech cases are limited to those "in which an individual must personally express **an opinion** with which he disagrees,'" (Def. Mem. pp. 17-18 (emphasis supplied)), and that compelled speech cases are inapposite because "the inclusion of factual information on the menu conveys no **point of view.**"

Def. Mem. p. 18 (emphasis supplied); *see* Def. Mem. p. 13 ("The number of calories that a food contains is a fact that is either true or not."). This argument is incorrect for two reasons. *First*, the regulation requires much more than simple commercial disclosure. *Second*, the First Amendment's protection against compelled speech extends to facts and is not limited to opinions and points of view.

### 1. The Regulation Requires Much More than Simple Commercial Disclosure

Regulation 81.50 goes well beyond what might typically be thought of as a commercial disclosure law. By design and effect, the regulation forces customers to look at the number of calories in a meal before they order food in a restaurant. Under the regulation, it will not be possible to buy a meal—at least in certain restaurants—without being forced to look at calorie counts, regardless of whether the individual wants to look at them or not. He or she must look because, in the city's view, "[a]nyone who thinks we're going to walk away from trying to tell the public what they're eating and what it's doing to them doesn't understand the obligation this city's health department has . . . . We have to tell people how to lead better lives." Ray Rivera, *Battle Over Calorie-Posting May Widen*, N.Y. TIMES, Sept. 13, 2007, at B3 (attached at Supp. App. A). In other words, the city has a health message for its citizens: "you are required to think about eating fewer calories; doing so will make you lead a better life."

Whether it is appropriate for government to force its view of a better life on its citizens is a hotly debated question. Some, like the New York City Board of Health, believe very strongly that it is. Others, however, believe equally strongly that the government's coercive powers should not be used that way. Governor Schwarzenegger

adopted this second position when he vetoed a bill very similar to Regulation 81.50.[7]

The question in this case is not which vision of government is better or more appropriate.  It is whether the First Amendment permits the city to coerce a selected group of restaurant owners to espouse the city's view that it is appropriate to force their customers to look at certain information before buying food.  The restaurant owners do not believe that their customers should be treated in this manner, nor do they believe they should be coerced to speak the city's contrary point of view as if it were their own.

### 2.    The First Amendment Protects Against Compelled Statements of Facts as Well as Opinions and Points of View

The city contends that the First Amendment does not protect against compelled statements of fact.  That is incorrect.  The First Amendment's protection of those who wish not to speak "applies not only to expressions of value, opinion, or endorsement, but equally to statements of fact the speaker would rather avoid."  *Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557, 573-74 (1995) (citations omitted).  In *Riley v. National Federation of the Blind of N.C., Inc.*, 487 U.S. 781 (1988), the Court specifically rejected the argument the city makes here, refusing to distinguish earlier compelled-speech cases "simply because [the earlier cases] involved compelled statements of opinion while here we deal with compelled statements of 'fact':  either

---

[7] Veto Message by Governor Schwarzenegger of California Senate Bill 120 (Oct. 14, 2007) ("Inflexible mandates applied sporadically are not an effective way to continue our progress in educating Californians about health living.") (attached at Supp. App. B); *see also* Patrick Basham and John C. Luik, Nutrition Labeling on Menu Boards and Menus: A Recipe for Failure (Washington Legal Foundation, Critical Legal Issues, December 2007), pp. 20-21 ("[t]hese proposals are deeply inappropriate.  This is because the evidence suggests that this is not regulation designed to provide information for 'informed' choice, but regulation designed to change supplier and consumer behavior based on the assumption that the regulator knows best.") (attached at Supp. App. C).

form of compulsion burdens protected speech." 487 U.S. at 797-98. Neither the city nor its *amici* cite *Hurley* or *Riley*.[8]

The city and *amici* attempt to distinguish this case from *United Foods* and compelled-speech cases on the theory that no "point of view" has been forced on the restaurants subject to Regulation 81.50. Def. Mem. p. 18; Pomeranz Mem. p. 15. In the first place, as we have discussed above, there is no question that the restaurants are being compelled to espouse a point of view about whether their customers should be forced to look at calorie counts before dining. In addition, restaurants have been told to convey a message about the significance of particular facts—here, calories are the most important fact to consider in choosing a meal. In compelled-speech cases, the "message" triggering First Amendment scrutiny may be the *significance* of particular facts. Thus, in *Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67 (2d Cir. 1996), the Second Circuit struck down a law that required labeling to disclose the presence of rBST growth hormone in milk, accepting plaintiff's argument that the law "compel[led] them 'to convey a message regarding the ***significance*** of rBST use that is expressly contrary to their views.'" 92 F.3d at 71-72 (emphasis supplied; internal quotations omitted). In *United Foods*, the promotional material at issue was set out in an appendix to Justice Breyer's dissent. It conveyed no "point of view" in the sense that the city uses that phrase. It listed several

---

[8] In addition, the city and *amici* have not fairly paraphrased the *Johanns* opinion (Def. Mem. p. 17-18; Pub. Cit. Mem. pp. 31-32). The actual quotation reads, "We have sustained First Amendment challenges to allegedly compelled expression in two categories of cases: true 'compelled-speech' cases, in which an individual is obliged personally to express **a message** he disagrees with, imposed by the government; and 'compelled-subsidy' cases, in which an individual is required by the government to subsidize a message he disagrees with, expressed by a private entity. *Johanns*, 544 U.S. at 557 (emphasis supplied). In the paraphrase, the city and its *amici* substitute "an opinion" for "a message."

recipes for dishes that included mushrooms (ginger-mushroom stir-fry, mushroom Caesar salad, mushrooms Santa Fe, and mushroom kebabs), gave tips for the storage and preparation of mushrooms, and set out basic information about a few of the more popular mushroom varieties. 533 U.S. at 431 (appendix). The Court had no difficulty concluding that this constituted "speech with which [the plaintiffs] disagree." *Id.* at 411.

**B.    "Reasonableness" Review Is the Wrong Standard**

The city and its *amici* argue that neither the compelled speech cases nor *Central Hudson* applies here and that the case must be evaluated only under a "reasonableness" standard, relying on *Zauderer*, 471 U.S. 626 (1985), and *Sorrell*, 272 F.3d 104 (2d Cir. 2001). But we respectfully submit that the "reasonably related" standard cannot govern this case. The city's preferred approach is not consistent with the Supreme Court's First Amendment jurisprudence, which recognizes robust protection of commercial speech and has consistently forbidden forced communication by a private citizen of a governmental message.

**1.    Reasonableness Scrutiny for "Disclosure" Requirements Would Clash With Supreme Court First Amendment Jurisprudence**

The city argues in favor of reduced scrutiny for commercial disclosure requirements by asserting that commercial speech is less valuable *per se* than political speech or ideological speech, that the only value of commercial speech is its "value to consumers" and that the interest in *not* providing factual information in advertising is "minimal." Def. Mem. pp. 15-16. Some language in the Supreme Court's 1985 opinion

in *Zauderer* supports these statements.[9] But the *holding* in *Zauderer* was different.  The

Court held that "an advertiser's rights are adequately protected as long as disclosure

requirements are reasonably related to the *State's interest in preventing deception of*

*consumers.*" 471 U.S. at 651 (emphasis supplied).  We explained in our opening brief

that this limitation derives from the *absence* of First Amendment protection for

misleading and deceptive commercial speech—just as obscenity, fighting words, and

statements necessary to commit crimes do not merit such protection.  In *United Foods*—

decided 16 years after *Zauderer*—the Court expressly rejected the wider application of

"reasonable basis" review as urged by the city here and limited the *Zauderer* standard to

laws necessary to prevent deception:

> Our conclusions are not inconsistent with the Court's
> decision in *Zauderer* . . ., a case involving attempts by a
> State to prohibit certain voluntary advertising by licensed
> attorneys.  The Court invalidated the restrictions in
> substantial part but did permit a rule requiring that
> attorneys who advertised by their own choice and who
> referred to contingent fees should disclose that clients
> might be liable for costs.  Noting that substantial numbers
> of potential clients might be misled by omission of the
> explanation, the Court sustained the requirement as
> consistent with the State's interest in "preventing deception
> of consumers." *Id.*, at 651. There is no suggestion in the
> case now before us that the mandatory assessments
> imposed to require one group of private persons to pay for
> speech by others are somehow necessary to make voluntary
> advertisements nonmisleading for consumers.

---

[9] The city also relies on *Meese v. Keene*, 481 U.S. 465 (1987), and *PruneYard Shopping
Center v. Robins*, 447 U.S. 74 (1980), but those cases are very far afield.  In *Keene*, the
plaintiff was not challenging the disclosure of his identity as an affiliate of a foreign
government, but rather objected to the statutory use of the words "political propaganda"
in the statute. 481 U.S. at 471.  And in *PruneYard*, the Court distinguished its holding
from other compelled speech cases on the basis that "no specific message is dictated by
the State [in this case] to be displayed on appellants' property." 447 U.S. at 87.

*United Foods*, 533 U.S. at 416 (citations omitted).

Moreover, the city's First Amendment theory cannot be reconciled with the Supreme Court's commercial speech cases decided after *Zauderer*. Those cases reflect an increasing recognition that commercial speech is of vital importance to First Amendment values and question the validity of distinguishing at all between "commercial" and "non-commercial" speech. As the Supreme Court explained in *United Foods*, "[t]he subject matter of the speech may be of interest to but a small segment of the population; yet those whose business and livelihood depend in some way upon the product involved no doubt deem First Amendment protection to be just as important for them as it is for other discrete, little noticed groups in a society which values the freedom resulting from speech in all its diverse parts." 533 U.S. at 410.[10] And in *Edenfield v. Fane*, 507 U.S. 761 (1993), the Court explained:

> The commercial marketplace, like other spheres of our social and cultural life, provides a forum where ideas and information flourish. Some of the ideas and information are vital, some of slight worth. But the general rule is that the speaker and the audience, not the government, assess the value of the information presented. Thus, even a communication that does no more than propose a commercial transaction is entitled to the coverage of the First Amendment.

507 U.S. at 767.[11]

---

[10] Defendant's suggestion that *Johanns* somehow limited *United Foods* in a way applicable to this case is wrong. In *Johanns*, the Court held that the subsidy at issue was "government speech" rather than the compelled subsidy struck down in *United Foods*. The "government speech" theory was not presented in *United Foods*. 533 U.S. 416-17; *see also Johanns*, 544 U.S. at 569 (Breyer, J., concurring) ("The 'government speech' theory the Court adopts today was not before us in *United Foods*"). There can be no suggestion here that what is required to be uttered on the menus is government speech rather than compelled speech by the restaurant owners.

[11] In addition, laws compelling disclosure are accepted on the ground that requiring all

[Footnote continued on next page]

## 2.    Disclosure Requirements Routinely Trigger Heightened First Amendment Scrutiny

The mere fact that a state law or regulation requires "disclosure" does not automatically exempt it from heightened First Amendment scrutiny.  It is beyond cavil that forced disclosure touching on ideological or political matters triggers heightened First Amendment scrutiny.[12]

The city and its *amici* contend that every disclosure statute or regulation on the books will be put in jeopardy if subject to heightened review under *Central Hudson*, rather than rational-basis review.  But the city's position is extreme.  Each requirement the city and *amici* cite is either directed toward preventing deception in commercial transactions,[13] has survived review under *Central Hudson* or even stricter scrutiny,[14] is

---

[Footnote continued from previous page]

vendors in a particular trade or business to make available certain information is necessary to preserve a "fair bargaining process" and are therefore consistent with the reasons for according constitutional protection to commercial speech.  To the extent they go beyond the preservation of a fair bargaining process, as this one does, it should not survive First Amendment scrutiny.  *See 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 501 (1996); *R.A.V. v. St. Paul*, 505 U.S. 377, 389 (1992); *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 577 (2001) (Thomas, J., concurring).

[12] Indeed, the Supreme Court has repeatedly struck down disclosure requirements under the First Amendment.  *See Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182, 197-200 (1999) (striking down state law requiring disclosure of names of petition circulators); *McIntyre v. Ohio Elections Comm.*, 514 U.S. 334 (1995) (state law requiring disclosure of names of authors of campaign literature); *Brown v. Socialist Workers '74 Campaign Comm.*, 459 U.S. 87 (1982) (disclosure of names of campaign contributors and recipients of funds); *Talley v. California*, 362 U.S. 60 (1960) (names and addresses of handbill authors).

[13] *See, e.g.*, 15 U.S.C. § 78*l* (registration requirements for securities, including anti-fraud disclosures); 21 U.S.C. § 343 (preventing misbranding in food); 21 C.F.R. § 202.1 (regulating drug advertisements to protect consumers from confusing or misleading advertisements); N.Y. Agric. & Mkts. Law § 214-h (requiring retail stores to disclose unit and total price information in an effort to discourage deceptive pricing) (*see Wegman's Food Markets, Inc. v. New York*, 76 A.D.2d 95, 98 (N.Y. App. Div. 1980)); 15 U.S.C. §§ 68-68*j* (requiring labeling of wool products' actual wool content, so as to "protect consumers against concealment of substitutes for wool in products claimed to be made wholly or partially of wool" (*Marcus v. FTC*, 354 F.2d 85, 87 (2d Cir. 1965))).

necessary to prevent otherwise unlawful activity,[15] or does not concern commercial speech at all.[16]

In addition, disclosure regulations promulgated under the NLEA have repeatedly been scrutinized under *Central Hudson*, notwithstanding their status as "disclosure" obligations. *See, e.g., Whitaker v. Thompson*, 353 F.3d 947, 952 (D.C. Cir. 2004) (upholding dietary supplement regulation under *Central Hudson*); *Pearson v. Shalala*, 164 F.3d 650, 654-60 (D.C. Cir. 1999) (striking down health claim regulation under *Central Hudson*); *see also Nutritional Health Alliance v. Shalala*, 144 F.3d 220, 225 (2d Cir. 1998) (dismissing First Amendment challenge to NLEA dietary-supplement regulations as unripe because *Central Hudson* requires a fact-specific inquiry). There is no reason why the city's closely related regulation requires lesser scrutiny.

One other aspect of this case distinguishes Regulation 81.50. Some of the examples provided by the city and its *amici* require disclosures about products that the government has found after extensive study to be inherently dangerous, such as cigarettes or alcohol. Calories are not dangerous *per se*. To the contrary, people cannot survive

---

[Footnote continued from previous page]

[14] 2 U.S.C. § 434 (political committee receipts and disbursements) (*see McConnell v. FEC*, 251 F. Supp. 2d 176 (D.D.C. 2003), *aff'd in part, rev'd in part*, 540 U.S. 93 (2003)); 15 U.S.C. § 1333 (cigarette labeling) (*cf. Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525 (2001)); 27 U.S.C. § 205 (labeling of alcoholic beverages) (*see Rubin v. Coors Brewing Co.*, 514 U.S. 476 (1995)); Cal. Health & Safety Code § 25249.6 (warnings of persons who will be intentionally exposed to carcinogens) (*see Baxter Healthcare Corp. v. Denton*, 15 Cal. Rptr. 3d 430, 449 n.5 (Cal. Ct. App. 2004)).

[15] *See Sorrell*, 272 F.3d at 107 n.1.

[16] *See, e.g.*, 33 U.S.C. § 1318 (preparation and filing of point source pollution discharge reports); 42 U.S.C. § 11023 (preparation and filing toxic chemical release reports); 29 C.F.R. § 1910.1200 (employer notifications of workplace chemical hazards); N.Y. E.C.L. § 33-0707 (submission of pesticide formulas to state commissioner).

without consuming calories. Disclosures concerning inherently dangerous products are fundamentally different from what is happening here: the city is forcing 10% and only 10% of the city's vendors to highlight prominently one aspect of their products (calories) that is not dangerous *per se* for the express purpose of discouraging consumers from buying the product.

### 3. *Sorrell* and Cases from Other Circuits Do Not Support "Reasonableness" Review

We do not believe that *Sorrell* governs here. The state law at issue in *Sorrell* required lamp manufacturers to label their mercury-containing products and to include instructions for lawful disposal under an environmental protection statute. At its core, *Sorrell* allowed the state to require manufacturers to provide non-controversial information necessary for their customers to avoid running afoul of the law. *Sorrell* is not this case. Regulation 81.50 serves no law-enforcement purpose and is not necessary to help customers avoid breaking the law. As the court acknowledged in *Sorrell*, a regulation that presented a real "risk that the state is forcing speakers to adopt disagreeable state-sanctioned positions, suppressing dissent, confounding the speaker's attempts to participate in self-governance, or interfering with an individual's right to define and express his or her own personality" would be different. 272 F.3d at 114. As described above, the city's regulation would force restaurant owners to espouse a controversial view about whether their customers should be required to look at calorie counts before buying a meal. This is the kind of situation that the *Sorrell* court anticipated and distinguished. *See supra*, pp. 15-16.

The city also relies on four cases from other circuits that deserve mention. The

city cites *Entertainment Software Association v. Blagojevich*, 469 F.3d 641 (7th Cir.

2006), but that case supports the plaintiff's position, not defendants'.  There, the court

struck down a state law requiring video game retailers to make a "disclosure" by putting

a label with the number 18 on sexually explicit video games.  The Court stated:

> As the Supreme Court recently observed, some of its
> "leading First Amendment precedents have established the
> principle that freedom of speech prohibits the government
> from telling people what they must say."  The Court has
> stated that where a statute "[m]andat[es] speech that a
> speaker would not otherwise make, that statute "necessarily
> alters the content of the speech."  Moreover, "speech does
> not lose its protection because of the corporate identity of
> the speaker."

469 F.3d at 651 (citations omitted).  The Court held that the "18" sticker "ultimately

communicates a subjective and highly controversial message—that the game's content is

sexually explicit."  *Id.* at 652.  "Requiring a private party to give significant space to a

third party whose message potentially conflicts with the plaintiff's was the very

Government action the Supreme Court found to be unconstitutional in *Pacific Gas and

Electric*."  *Id.* at 653.

The city and *amici* also rely on *Pharmaceutical Care Management Ass'n v. Rowe*,

429 F.3d 294 (1st Cir. 2005), but that was a case about preserving a fair bargaining

process.  The statute required Pharmacy Benefit Managers ("PBMs") to disclose conflicts

of interest, disgorge profits from self-dealing and disclose certain financial arrangements

with third parties.  *Id.* at 299.  These requirements were for the purpose of "protecting

covered entities from questionable PBM business practices" and therefore served the

state's interest in "preventing deception."  *Id.* at 316.  The case does not purport to

expand *Zauderer* in the way the city suggests.

Likewise, *Environmental Defense Center, Inc. v. EPA*, 344 F.3d 832 (9th Cir. 2003), did not expand *Zauderer* in the way the city suggests. Rather, the court held that the statutory provision was "consistent with the regulatory goals of the overall scheme of the Clean Water Act, *cf. Glickman v. Wileman Bros. & Elliott, Inc.*, 521 U.S. 457, 476 (1997)." 344 F.3d at 849. Finally, *European Connections & Tours, Inc. v. Gonzalez*, 480 F. Supp. 2d 1355 (N.D. Ga. 2007), is irrelevant. That case concerned a federal statute designed to protect foreign women from being lured into the United States as sex slaves. It imposed certain reporting requirements on "marriage brokers" arranging marriage for so-called mail-order brides to protect the women from being lured to the United States by men with records of domestic violence, human trafficking, or child abuse. The court held that this reporting requirement does not regulate commercial speech at all. 480 F. Supp. at 1370. The court then went on hold that the statute passed muster under every form of First Amendment scrutiny. *Id.* at 1371 & n.7.

## C. Regulation 81.50 Cannot Survive Review Under *Central Hudson*

Just as Regulation 81.50 fails when viewed as compelled speech, it also fails under the test for commercial speech enunciated in *Central Hudson*. Under the standard set out in *Central Hudson*, governmental burdens on commercial speech are subject to a four-part inquiry asking: (1) whether the expression concerns lawful activity and is not misleading; (2) whether the asserted governmental interest is substantial; (3) whether the challenged law directly advances the asserted interest; and (4) whether the challenged law is not more extensive than is necessary to serve the asserted interest. 447 U.S. at 566.

The city concedes that menus and menu boards without calories listed are not misleading. Def. Mem. p. 27 ("There is no dispute as to the first two prongs [of *Central*

- 25 -

*Hudson*]"). Plaintiff agrees that the city has a substantial interest in curbing obesity.

      **1.**    **Regulation 81.50 Does Not Advance The City's Asserted Interest In Curbing Obesity in a "Direct and Material Way"**

Under *Central Hudson*, the city must prove that Regulation 81.50 advances the government's asserted, substantial interest in combating obesity in a "direct and material way." *Edenfield*, 507 U.S. at 767. This burden cannot be met by "speculation or conjecture": the constitutional interests at stake require the government to "demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Id*. at 770-71.

In *Edenfield*, the state "present[ed] no studies that suggest personal solicitation of prospective business clients by CPA's creates the dangers of fraud, overreaching, or compromised independence that the Board claims to fear." 507 U.S. at 771. This doomed the regulation. In contrast, in *Lorillard*, the Court found this test met by extensive governmental and public health studies that "demonstrated a link between advertising and demand" for tobacco products. 533 U.S. at 560. Here, no study is offered demonstrating a link between posting calories and reducing obesity. Dr. Allison's declaration (pp. 29-30) states that there are not studies that support the conclusion that (to use the words of *Edenfield*) Regulation 81.50 "will in fact alleviate [obesity] to a material degree." *See* 507 U.S. at 771. The city does not dispute Dr. Allison's statement that there are no randomized controlled studies that come to this conclusion. Dr. Allison then went on to ask whether there are *observational* studies that "show a consistent association between the independent variable of interest—in this case, posting calorie information in chain restaurants in the manner required by the Regulation—and the

outcome of interest—in this case, obesity." Allison Supp. Decl. ¶ 5. His supplemental declaration fairly captures the state of the record:

- I surveyed the literature and asked: Are there are any observational studies in the literature that demonstrate an association between such calorie posting, whether or not in chain restaurants, and obesity? I concluded that there are none. None of the City experts have stated otherwise.

- I then asked: Are there any observational studies that demonstrate an association between such calorie posting, whether or not in chain restaurants, and any weight change in the customers, or any decrease in caloric intake over an extended period? I concluded that there are none. None of the City experts have stated otherwise.

- I then asked: Are there any observational studies that demonstrate an association between calorie posting and the customers' caloric intake over a period of a week, or even a single day? I concluded that there are none, and none of the City experts have stated otherwise.

*Id.* As stated in Dr. Allison's affidavit, the city's declarations do not point to a single observational study that demonstrate an association between calorie posting and weight loss, or caloric intake, over a period of a month, a week, or even a single day.

The city relies on a survey it conducted in anticipation of comparing "before" and "after" behavior during a single meal in restaurants affected by Regulation 81.50. The study has not been completed, so the city here relies only on data collected only in the "before" phase. As Dr. Allison explains, the survey was "certainly not an observational study that would fall into any of the categories mentioned in the preceding paragraph. It did not report on obesity, weight change or caloric intake over an extended period of time or even a single day." Allison Supp. Decl. ¶ 6.

The city offers no other evidence that the regulation will in fact alleviate obesity.

Its declarations couch their opinions in words like "could be" and "might" and "may."[17]
The city also relies on "common sense" and "consensus," but the cases require evidence.
*See, e.g., Lorillard,* 533 U.S. at 555-61 (relying on the "numerous studies" conducted and
evidence gathered the FDA, the Surgeon General, the FTC, and the National Cancer
Institute on the causal link between "tobacco advertising and trends in the use of various
tobacco products"); *44 Liquormart,* 517 U.S. at 505 ("We can agree that common sense
supports the conclusion that a prohibition against price advertising . . . will tend to
mitigate competition and maintain prices at a higher level than would prevail in a
completely free market. . . . However, without any findings of fact, or indeed any
evidentiary support whatsoever, we cannot agree with the assertion that the price
advertising ban will significantly advance the State's interest in promoting temperance.");
*Florida Bar v. Went For It, Inc.,* 515 U.S. 618, 626-27 (1995) (noting the "breadth of
detail" of studies with statistical and anecdotal data in support of the government's
regulation); *Rubin v. Coors Brewing Co.,* 514 U.S. at 487-88 (rejecting the government's
arguments based on "common sense" and history, and finding that the statute "cannot
directly and materially advance [the government's] asserted interest"); *Ibanez v. Florida
Dept. of Bus. & Prof. Reg. of Accountancy,* 512 U.S. 136, 144 (1994) ("To survive
constitutional review, the Board must build its case on specific evidence . . . .").[18]

---

[17] *See, e.g.,* Pi-Sunyer Decl. ¶ 3 ("§ 81.50 **could be** helpful to consumers in allowing
them to make more informed choices") (emphasis supplied); Schwartz Decl. ¶ 4 ("the
question for consideration is … whether the Department has legitimate reason to believe
that [§ 81.50] **might** contribute to reducing obesity levels or slowing the obesity epidemic
in NYC.") (emphasis altered); Popkin Decl. p. 3 ("posting calories **may** help").

[18] For the proposition that "common sense" and "consensus" might be enough, the city
cites *Lorillard.* But the *Lorillard* court did not look to "common sense" or "consensus."
It looked to evidence. The "simple common sense" quotation came from *Burson v.
Freeman,* 504 U.S. 191, 211 (1992), which concerned the lawfulness of restricted zones

[Footnote continued on next page]

Although the kind of speculation and conjecture involved here might be sufficient to support certain government initiatives—for example, providing educational literature to city residents, or teaching good health practices in schools, or encouraging restaurants voluntarily to provide customers with certain information—it is insufficient to support a coercive governmental program burdening the First Amendment rights of those regulated.  That is the core meaning of the third prong of *Central Hudson.*

### 2.    Regulation 81.50's Infringement On Speech Is More Extensive Than Necessary To Serve The City's Asserted Interest

Under *Central Hudson*, even when a governmental burden on speech is effective to a material degree, it must still employ a means "narrowly tailored to achieve the desired objective." *Lorillard*, 533 U.S. at 556 (internal quotations omitted); *44 Liquormart*, 517 U.S. at 529 (O'Connor, J., concurring).

In this case, many alternatives provide customers with caloric information in restaurants without so heavily burdening restaurants' First Amendment rights by co-opting their most important communication tool and using it to convey a message with which they disagree.  *See* Horn Decl. ¶ 2; Smoot Decl. ¶¶ 8-9; Keystone Forum *Final Report* App. J at pp. 128-33.

---

[Footnote continued from previous page]

around voting places.  The Court said: "an examination of the history of election regulation in this country reveals a persistent battle against two evils:  voter intimidation and election fraud.  After an unsuccessful experiment with an unofficial ballot system, all 50 States, together with numerous other Western democracies, settled on the same solution:  a secret ballot secured in part by a restricted zone around the voting compartments.  We find that this widespread and time-tested consensus demonstrates that some restricted zone is necessary in order to serve the States' compelling interests in preventing voter intimidation and election fraud. * * *  A long history, a substantial consensus, and simple common sense show that some restricted zone around polling places is necessary to protect that fundamental right [to vote]." *Id.* at 206, 211.

The availability of so many alternatives shows that the city has not narrowly tailored its regulation. The city claims that its survey supports a requirement of calories on the menu boards. Def. Mem. pp. 23-24. It contends that the survey shows that more patrons of Subway restaurants saw calorie information in the Subway restaurants than at other restaurants and that those who saw the information ordered fewer calories. *Id.* But as Dr. Allison points out, the underlying data from the city's study show that Subway restaurants did not use menu boards. It used a variety of methods of communicating calorie information including methods used by many other restaurants, such as posters, pamphlets, food wrappers, napkins, and cups. Allison Supp. Decl. ¶ 7. There is no way to tell from the documents supplied by the city whether the customers who saw calorie information saw it on "a sticker placed on a display case near the cash register"[19] (which were in a minority of locations), or instead saw it through other forms of communication (pamphlets, wrappers, etc.), which the city claims are inadequate.

---

[19] Frieden Dec. ¶ 32.

## CONCLUSION

The Court should enter an order:  (1) granting declaratory judgment in favor of

Plaintiff on its preemption claim, and (2) granting a preliminary injunction against

enforcement of Regulation 81.50 pending a final adjudication of the merits.

Dated: February 14, 2008
      New York, New York

                              Respectfully submitted,

                              ARNOLD & PORTER LLP

                              By: _____
                                  Peter L. Zimroth
                                Kent A. Yalowitz
                                Nancy G. Milburn
                                Brandon Cowart

                              399 Park Avenue
                              New York, New York  10022
                              (212) 715-1000

                              *Counsel for Plaintiff, New York State*
                              *Restaurant Association*