UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
            :

NEW YORK STATE RESTAURANT        :
ASSOCIATION,                :       08 Civ. 1000 (RJH)
            :
           Plaintiff,     :
            :
            :     **MEMORANDUM OPINION**
   -against-       :        **AND ORDER**
            :

NEW YORK CITY BOARD OF HEALTH, et al.,  :
            :
          Defendants.    :
            :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

       Plaintiff, the New York State Restaurant Association ("NYSRA"), brings this action to declare unconstitutional and preliminarily enjoin enforcement of New York City Health Code Section 81.50 ("Regulation 81.50") adopted by the New York City Board of Health (the "City") in January 2008.  Regulation 81.50 requires certain chain restaurants that sell standardized meals to post caloric content information in their menus and on their menu boards.

       This controversy was previously before the Court when NYSRA challenged an earlier version of Regulation 81.50 promulgated in 2006.  *See N.Y. State Rest. Ass'n v. New York City Bd. of Health*, 509 F. Supp. 2d 351 (S.D.N.Y. 2007) ("*NYSRA I*").  The caloric posting requirements of the 2006 version of Regulation 81.50 only applied to restaurants that had already voluntarily disclosed nutrition information to their customers. Since the federal government had previously enacted a detailed scheme regulating the voluntary disclosure of nutrition information by restaurants, the Court concluded that Regulation 81.50 as enacted in 2006 was unconstitutional in that it was preempted by

federal statute, the Nutrition Labeling and Education Act of 1990 ("NLEA").  *See* 21 U.S.C. §§ 343(q), (r), 343-1(a)(4), (5).

The City did not appeal the judgment entered in *NYSRA I*, choosing instead to enact the current version of Regulation 81.50 in an attempt to cure the constitutional infirmities identified by the Court in its prior decision.  Thus the current version of Regulation 81.50 is not triggered by a restaurant's prior voluntary disclosure of nutrition information; rather, its application is mandatory for all restaurants of a certain size and type.[1]  The City contends that since NLEA does not seek to impose or regulate the mandatory disclosure of nutrition information by restaurants, the new regulation is not preempted by the federal statute.  NYSRA argues that the distinction between mandatory disclosure schemes and voluntary disclosure schemes is illusory and that the new regulation, like the old, is preempted by federal law.[2]  As a second string to its bow, NYSRA contends that Regulation 81.50 violates the First Amendment rights of its members because it impermissibly compels them to convey the government's message regarding the importance of calories, a message with which they may disagree.

For the reasons set forth below, the Court concludes that Regulation 81.50 is not preempted by NLEA because that statute explicitly leaves to state and local governments the power to impose mandatory nutrition labeling by restaurants.  The Court also finds that the required disclosure of caloric information is reasonably related to the

---

[1]  The current version of Regulation 81.50 applies to any "food service establishment within the City of New York that is one of a group of 15 or more food service establishments doing business nationally, offering for sale substantially the same menu items, in servings that are standardized for portion size and content, that operate under common ownership or control, or as franchised outlets of a parent business, or do business under the same name."  (Pl.'s App. Ex. L at 12.)

[2]  The parties agree that the issue of whether Regulation 81.50 is preempted by NLEA is ripe for summary judgment.  The Court agrees and grants the parties' request to treat their motion papers as asserting cross-motions for summary judgment on the issue of preemption.

government's interest in providing consumers with accurate nutritional information and

therefore does not unduly infringe on the First Amendment rights of NYSRA members.


# BACKGROUND

As noted in *NYSRA I,* familiarity with which is assumed, the parties agree that the

trend of increasing obesity in the United States poses a health threat to millions of

citizens.  In New York City, 56.1 percent of the adult population is overweight or obese.

Obese and overweight individuals are at a seriously higher risk of heart disease, diabetes,

stroke, and cancer, which diseases account for 70 percent of all deaths in the city.  The

attendant human, social, and financial costs are uncontested.[3]

Food served in restaurants plays an increasingly large role in an individual's diet.

It is estimated that one-third of daily caloric intake for all Americans comes from foods

purchased outside the home.  (Defs.' Mem. 21.)  The parties, as well as *amici*,[4] appear to

agree that providing nutritional information in restaurants is likely to assist customers to

make healthful food choices.  (Pl.'s Mem. 5.)  Indeed, a number of fast food restaurants

already provide a complete nutritional breakdown of their menu items in brochures, on

posters, or online.  The City has conducted a survey, however, indicating that few

customers actually see the nutrient information in fast food restaurants such as

---

[3]  Plaintiff's expert Dr. David Allison stated his agreement with the City and *amici* that there is "well-documented" evidence to support the proposition that "[o]besity has many deleterious effects for the individual including reduced longevity, reduced quality of life, and reduced health and may also be costly to society."  (Allison Decl. 9–10.)

[4]  Two *amici* briefs were filed in support of the City.  The first was submitted by Jennifer L. Pomeranz and Kelly D. Brownell of the Rudd Center for Food Policy and Obesity at Yale University.  The second was submitted by U.S. Representative Henry Waxman, Public Citizen, Center for Science in the Public Interest, American Diabetes Association, American Medical Association, American Public Health Association, California Center for Public Health Advocacy, the Medical Society of the State of New York, Trust for America's Health, and Professors of Medicine, Nutrition, and Public Health.

McDonald's, Dunkin' Donuts and Burger King that presently disclose such information. (Pl.'s App. Ex. L at 7–8.)  To address this perceived deficiency, new Regulation 81.50, like its predecessor, requires covered restaurants to post caloric information on menus and menu boards in a font and format comparable to that used to display the name or price of the menu items.  (Pl.'s App. Ex. L at 13.)  Unlike its predecessor, however, new Regulation 81.50 does not limit its application to those restaurants that have already voluntarily disclosed nutritional information.  New Regulation 81.50 is mandatory for all chain restaurants of a certain size whether or not they presently disclose nutritional information on a voluntary basis.  This distinction is critical to a determination of whether new Regulation 81.50 is preempted by federal law.  *See NYSRA I*, 509 F. Supp. 2d at 361–63.

## DISCUSSION

### I.    Preemption

#### A.    Mandatory Nutrition Disclosures and Voluntary Nutrition Claims Under NLEA

With the 1990 passage of NLEA, Congress enacted two distinct provisions regulating the disclosure of nutritional information to consumers.  The first section, 21 U.S.C. § 343(q), mandates specific, uniform disclosures that must be made on food labels, giving rise to the ubiquitous "Nutrition Facts" panel on packaged foods that sets forth calories per serving, as well as the amount or percentage of fat, cholesterol, sodium, carbohydrates, protein, and select vitamins and minerals.  The second section, 21 U.S.C. § 343(r), regulates when and how a food purveyor may voluntarily make claims about the nutrient content or health benefits of its product.  Thus NLEA and its implementing

regulations "encompass two kinds of information—the mandatory information on nutrients which will appear on the nutritional panel of nearly all food labels [§ 343(q)], and the voluntary information [§ 343(r)] that some manufacturers choose to add to their product labels." Elizabeth Toni Guarino, *Nutrient Descriptor and Disease Claims for Foods*, 48 Food & Drug L.J. 665, 671 (1993).

NYSRA now contends that the distinction between mandated disclosures under § 343(q) and voluntary claims under § 343(r) cannot be found in the statute or in FDA regulations.[5] By its very terms, however, subsection (q) identifies specific information that must appear on food labels while subsection (r) simply does not apply unless a nutritional claim is first made by a food purveyor. This obvious reading of the statute is consistent with Congress's stated purposes "to clarify and to strengthen the Food and Drug Administration's legal authority to *require* nutrition labeling on foods, and to establish the circumstances under which claims *may* be made about nutrients in food." H.R. Rep. No. 101-538, at 7 (1990), *reprinted in* 1990 U.S.C.C.A.N. 3336, 3337 (emphasis added). Not surprisingly, the FDA has consistently drawn the same distinction. *See* Food Labeling: Trans Fatty Acids in Nutrition Labeling, Nutrient Content Claims, and Health Claims, 64 Fed. Reg. 62,746-01, 62,758 (proposed Nov. 17, 1999) ("Nutrient content claims are voluntary statements that can assist consumers in selecting foods that may lead to a healthier diet."); Food Labeling; Nutrient Content Claims: Definition for "High Potency" and Definition of "Antioxidant" for Use in

---

[5] NYSRA actually embraced this distinction in the prior litigation as it supported its argument, adopted by the Court, that the 2006 version of Regulation 81.50 was preempted as a result of the overlap with NLEA's regulation of voluntary nutrient claims under § 343(r). Thus NYSRA acknowledged that "subsection (q) imposes *mandatory* food labeling requirements," while "[r]estaurants that *voluntarily* disclose nutrient information about menu items (including the caloric value of food) . . . are subject to [§ 343(r)]." (Pl.'s Mem. at 9–10, *NYSRA I*, 509 F. Supp. 2d 251 (No. 07 Civ. 5710) (emphasis added); *see also id.* at 10 ("Under the applicable regulations, restaurants *choose* whether to opt into the general nutrition claim and labeling scheme promulgated under subsection (r).") (emphasis added).)

Nutrient Content Claims for Dietary Supplements and Conventional Foods, 62 Fed. Reg. 49,868-01, 49,878 (Sept. 23, 1997) ("[T]he use of nutrient content claims is *entirely voluntary*.") (emphasis added); Food Labeling; Health Claims; Dietary Noncariogenic Carbohydrate Sweeteners and Dental Caries, 72 Fed. Reg. 52,783-01, 52,787 (Sept. 17, 2007) (regulatory impact analysis stating that FDA rule implementing section 343(r) is limited to "*voluntary claims*") (emphasis added); Food Labeling:  Nutrient Content Claims and Health Claims; Restaurant Foods, 58 Fed. Reg. 33,055-01, 33,058 (proposed June 15, 1993) ("[H]ealth or nutrient content claims are *voluntary*.") (emphasis added); Barbara Schneeman, *FDA's Review of Scientific Evidence for Health Claims*, 137 J. Nutr. 493–94 ("Health claims for foods and dietary supplements are *voluntary statements* that characterize the relation between a substance and its ability to reduce the risk of disease or health-related condition in healthy populations.") (emphasis added).[6]

### B.    Restaurants are Exempt from Section 343(q) but Subject to Section 343(r)

The NLEA expressly exempts restaurant food from mandatory nutrition labeling. *See* 21 U.S.C. § 343(q)(5)(A)(i).  In contrast to subsection (q), restaurants are generally not exempt from subsection (r) and are subject to FDA regulation if they choose to make a nutrient content claim.  *See* 21 C.F.R. § 101.13(q)(5) ("A nutrient content claim used on food that is served in restaurants . . . shall comply with the requirements of this section . . . .").  *See also NYSRA I*, 509 F. Supp. 2d at 357 (citing cases).[7]  As discussed

---

[6]  Section 343(r) regulates health claims (e.g., "reduces the risk of cancer") as well as nutrient content claims.  *See* 21 U.S.C. §§ 343(r)(1)(A), (B).

[7]  Restaurants have a limited exemption from subsection (r) to the extent they make certain claims relating to (1) cholesterol, (2) saturated fat, (3) dietary fiber, or (4) nutrients that increase the risk of diet-related health conditions.  *See* 21 U.S.C. § 343(r)(5)(B).

below, nutrient content claims regulated by subsection (r) are subject to a broad express

preemption provision under NLEA.  *See* 21 U.S.C. § 343-1(c)(5).

Subsection (r) applies to "a claim [] made in the label or labeling of [] food" that

"expressly or by implication characterizes the level of any nutrient."  21 U.S.C.

§ 343(r)(1).  A plain reading of the statutory language could support an interpretation that

limits the reach of subsection (r) to qualitative statements such as "high fiber," "low

cholesterol," or "lite."  Under such a reading, a factual statement of nutrient amount, say

"5 grams of fat," or "100 calories," that does not characterize the nutrient level would fall

outside subsection (r) and applicable regulations.  Not surprisingly, the City endorses this

reading of the statute and argues that the caloric disclosure mandated by Regulation 81.50

necessarily falls outside the scope of subsection (r) (and, of course, the concomitant

preemption provision, § 343-1 (a)(5)).  However, as discussed in detail in *NYSRA I*, the

FDA takes a "considerably broader view" of the scope of its authority under subsection

(r).  *See NYSRA I*, 509 F. Supp. 2d at 359.  Thus, the most pertinent regulation defines a

claim to include "any direct statement about the level (or range) of a nutrient in the food,

e.g., . . . 'contains 100 calories.'"  21 C.F.R. § 101.13(b)(1).  Yet in other contexts, the

FDA has expressed the contrary view.  For example, in the preamble to the regulations

implementing § 343(r), the FDA noted that factual statements such as "100 calories"

cannot be considered to characterize in any way the level of a nutrient in a food, Food

Labeling:  Nutrient Content Claims, General Principles, Petitions, Definition of Terms;

Definitions of Nutrient Content Claims for the Fat, Fatty Acid, and Cholesterol Content

of Food, 58 Fed. Reg. 2,302, 2,310 (Jan. 6, 1993), in which case such a statement would

be excluded from coverage by the very words of the statute.  *See* 21 U.S.C. § 343(r).

While the question is a close one, the Court concluded, after reviewing all the relevant FDA statements, that the agency's interpretation of subsection (r) as applying to simple factual statements (*e.g.*, "contains 100 calories") was entitled to deference. *See NYSRA I*, 509 F. Supp. 2d at 358–61. Therefore, the Court also concluded that a restaurant's voluntary disclosure of the caloric content of its meals would be a claim subject to regulation under subsection (r). *Id.* at 360. Since the operation of the 2006 version of Regulation 81.50 was triggered by such a voluntary disclosure or claim, the Court ultimately concluded that the regulation was preempted. *Id.*

> **C.**    **A Mandatory Disclosure of Caloric Content is Not a Claim Under Section 343(r)**

As noted, the current version of Regulation 81.50 is not triggered by a restaurant's prior voluntary disclosure of nutritional information. NYSRA contends nevertheless that restaurants that are required by the new regulation to disclose caloric content will still be making a claim that is subject to federal regulation under § 343(r). In common parlance, however, a mandatory disclosure is not a claim, which term carries the connotation of an assertion by a speaker that is voluntary in nature. NYSRA would define any statement regardless of context as a claim, but such a reading is inconsistent with the language of NLEA. *See* 21 U.S.C. § 343(r)(1) ("A statement of the type *required* by paragraph (q) that appears as part of the nutrition information required or permitted by such paragraph is *not* a claim which is subject to this paragraph . . . .") (emphasis added). The FDA regulations draw the same distinction. *See* 21 C.F.R. § 101.13(c) ("Information that is *required* . . . to be declared in nutrition labeling, and that appears as part of the nutrition label, is *not* a nutrient content claim and is *not* subject to the requirements of this section.") (emphasis added). Subsection (r), therefore, provides that a statement as to

nutrient amount is not a claim when it is a mandated disclosure.  NYSRA ultimately

accepts this conclusion (Pl.'s Mem. 14–19) but contends that the exclusion from

subsection (r) only applies to nutrient content disclosures mandated by the federal

government and not to disclosures mandated by state or local authorities (*id*. at 22–26).

This reading of the statute, however, would frustrate the explicit preservation of state

power to mandate nutritional disclosure by restaurants found in the statute's preemption

provisions.  *See* 21 U.S.C. §§ 343-1(a)(4), (5).

> **D.    New Regulation 81.50 Is Not Preempted by NLEA**

Congress approached the scope of NLEA's preemption provisions with care.  *See,*
*e.g.*, 136 Cong. Rec. 516607-02, S1611 (Oct. 24, 1990) (Sen. Hatch) (confirming that

"the carefully crafted uniformity section of this legislation is limited in scope").  As an

initial matter, NLEA precludes implied preemption of state regulations.  *See* Pub. L. No.

101-535, § 6(c), 104 Stat. 2535, 2364 ("The Nutrition Labeling and Education Act of

1990 shall not be construed to preempt any provisions of State law, unless such provision

is expressly preempted under [§ 343-1] of the Federal Food, Drug and Cosmetic Act.").

However, Congress added two express preemption provisions, 21 U.S.C. § 343-1(a)(4)

and (a)(5), that address the scope of preemption for mandatory labeling requirements

under § 343(q) and for nutrient content claim regulations under § 343(r).

Section 343-1(a)(4) preempts any state "requirement for nutrition labeling of food

that is not identical to the requirement of [§ 343(q)], except a requirement for nutrition

labeling of food which is exempt" from § 343(q).  Since food served in restaurants is

explicitly exempt from § 343(q), state authority to impose mandatory nutrition labeling

on restaurants is necessarily preserved.  *See Pelman v. McDonald's Corp.*, 237 F. Supp.

2d 512, 526 (S.D.N.Y. 2003) ("§ 343-1(a)(4) does not expressly bar [state-mandated] nutrition labeling on restaurant foods either directly or . . . indirectly."); *see also* 136 Cong. Rec. S16607 (Oct. 24, 1990) (Sen. Metzenbaum) ("Because food sold in restaurants is exempt from the nutrition labeling requirements of [§ 343(q)], the bill does not preempt any State nutrition labeling requirements for restaurants."); (Pl.'s App. Ex. H ("FDA, Food Labeling: Questions and Answers, Volume II, 'A Guide for Restaurants and Other Retail Establishments'" (Aug. 1995)) at ¶ R31 ("*Question*: Can a State require restaurant foods to bear nutrition labeling even if the food is exempt under Federal requirements? *Answer*: Yes . . . [B]ecause the act exempts restaurant foods that do not bear a claim from mandatory nutrition labeling, State requirements for the nutrition labeling of such foods would not be preempted.")).

NYSRA concedes as much but contends that mandatory state disclosures are nevertheless preempted by 21 U.S.C. § 343-1(a)(5). This section preempts states from regulating nutrient content claims made by a food purveyor, which claims are subject to FDA regulation under § 343(r). Since restaurants that make nutrient content claims are not exempt from subsection (r), NYSRA contends that any effort by state or local authorities to require restaurants to disclose nutrient contents is preempted. NYSRA's position is internally consistent but of course ignores the mandatory/voluntary architecture of § 343(q) and (r) discussed above, as well as the obvious intent of Congress in drafting § 343-1(a)(4), which explicitly preserves state authority to impose nutrition labeling requirements on restaurants. NYSRA's reading of the statute would also create a regulatory vacuum in which neither federal nor state authorities have the power to require restaurants to disclose nutrition information to consumers. A far more persuasive reading

is that Congress chose not to exercise this power and explicitly left it to the states to do so. *Compare* 21 U.S.C. § 343(q) *with* § 343-1(a)(4).

NYSRA also argues that the mandatory/voluntary distinction between § 343(q) and § 343(r) and their respective preemption provisions will lead to "absurd results." (Pl.'s Mem. 25–26.) According to NYSRA, a city could mandate disclosure by a restaurant that a menu item was "low in fat" and then seek to avoid preemption on the basis that the statement is no longer a claim because it was mandated. Thereby, a city would be "free to override the federal regime" regarding the regulation of claims under § 343(r). *Id.* at 26. There is a world of difference, however, between the qualitative statement "low in fat" and the quantitative statement "100 calories." The latter is clearly an unadorned statement of fact that is contemplated by § 343(q) to be disclosed on a food label. And in the absence of federal regulation, it is precisely this type of disclosure that states may mandate. On the other hand, the statement "low in fat" characterizes the level of a nutrient and would be subject to regulation under § 343(r) when voluntarily made. Even if mandated, it would not escape the reach of § 343(r) for the added reason that only a "statement of the type required by paragraph (q)" is exempt from regulation under subsection (r). 21 U.S.C. § 343(r). "Low in fat" is not such a statement.

In sum, the Court sees no reason to alter the analysis set forth in *NYSRA I*. Because the 2006 version of Regulation 81.50 was contingent upon the making of a voluntary claim, the Court concluded that the City had adopted a regulatory approach that was in the "heartland" of § 343(r) and subject to preemption under § 343-1(a)(5). Now the City has adopted an approach that is wholly mandatory and requires the disclosure of nutrient information of a type well within the heartland of § 343(q). As a result, new

Regulation 81.50 is not subject to preemption under § 343-1(a)(5) and, indeed, is preserved from preemption by virtue of § 343-1(a)(4).

## II.    First Amendment

### A.    The Proper Analytical Framework

NYSRA argues that Regulation 81.50 violates the First Amendment rights of its members to be free from compelled speech. *See, e.g., Wooley v. Maynard*, 430 U.S. 705, 714 (1977) (stating that the First Amendment protects "both the right to speak freely and the right to refrain from speaking at all").

The parties concede that Regulation 81.50 implicates only commercial speech, which is subject to "'less stringent constitutional requirements' than other forms of speech." *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104, 113 (2d Cir. 2001) (quoting *Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 72 (2d Cir. 1996)); *see also, e.g., Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 562–63 (1980) ("The Constitution therefore accords a lesser protection to commercial speech than to other constitutionally guaranteed expression."). Commercial speech is "usually defined as speech that does no more than propose a commercial transaction." *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001); *see also Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 473–74 (1989) (stating that the "test for identifying commercial speech" is whether the speech "propose[s] a commercial transaction"). Regulation 81.50 only requires disclosure of calorie information in connection with a proposed commercial transaction—the sale of a restaurant meal. Thus, the category of speech affected by Regulation 81.50 falls squarely within the traditional definition of commercial speech.

The rationale for extending First Amendment protection to commercial speech is the strong public interest in "intelligent and well informed" economic decisions and the "free flow of commercial information." *Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 765 (1976); *see also, e.g., 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 496 (1996) (noting the Supreme Court's conclusion in *Virginia State Board of Pharmacy* that "the public's interest in receiving accurate commercial information . . . supports an interpretation of the First Amendment that provides constitutional protection for the dissemination of accurate and nonmisleading commercial messages"). The Supreme Court, however, has also "recognized the strong government interest in certain forms of economic regulation, even though such regulation may have an incidental effect on rights of free speech and association." *N.A.A.C.P. v. Claiborne Hardware Co.*, 458 U.S. 886, 912 (1982). Moreover, regulations that require disclosure of "factual and uncontroversial" commercial information are subject to "more lenient review" than prohibitions or restrictions on commercial speech, and need only be "reasonably related to the State's interest in preventing deception of consumers." *Sorrell*, 272 F.3d at 113–14 (citing *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 650, 651 (1985)). As the Second Circuit has explained,

> Commercial disclosure requirements are treated differently from restrictions on commercial speech because mandated disclosure of accurate, factual, commercial information does not offend the core First Amendment values of promoting efficient exchange of information or protecting individual liberty interests. . . . Protection of the robust and free flow of accurate information is the principal First Amendment justification for protecting commercial speech, and requiring disclosure of truthful information promotes that goal.

*Id.* at 113–14; *see also Zauderer*, 471 U.S. at 651 (noting that "disclosure regulations trench much more narrowly on an advertiser's interests than do flat prohibitions on speech").

In *Zauderer*, the Supreme Court considered the First Amendment implications of Ohio's disciplinary rules for attorneys, one of which required any attorney who advertised that representation was available on a contingent fee basis to disclose the fact that clients would be responsible for costs associated with the litigation. 471 U.S. at 633–35, 650–53. The Court noted at the outset that there were "material differences between disclosure requirements and outright prohibitions on speech" and that, though the First Amendment prohibited some compelled speech, "the interests at stake in [*Zauderer*] are not of the same order" as those in previous cases involving compelled speech outside the commercial context. *Id.* at 650–51. Specifically, Ohio only required the disclosure of "purely factual and uncontroversial information"; it did not "attempt[] to 'prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein.'" *Id.* at 651 (quoting *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)). The Court explained that "[b]ecause the extension of First Amendment protection to commercial speech is justified principally by the value to consumers of the information such speech provides, [the] appellant's constitutionally protected interest in not providing any particular factual information in his advertising is minimal." *Id.* As a result, the Court held that "an advertiser's rights are adequately protected as long as disclosure requirements are reasonably related to the State's interest in preventing deception of consumers." *Id.*

State-mandated disclosures were also under review in *Sorrell*.  272 F.3d at 107–

08.  Therein, the court addressed a Vermont statute that required manufacturers of certain

products containing mercury to label those products to indicate that the products contain

mercury and should be recycled or disposed of as hazardous waste.  *Id.* at 107.  The

Second Circuit reversed the district court's grant of a preliminary injunction barring

enforcement of the statute, finding, *inter alia*, that the district court had improperly

applied the four-part test of *Central Hudson Gas & Electric Corp. v. Public Service

Commission of New York*, 447 U.S. 557 (1980), which is used to evaluate the

constitutionality of measures that *restrict* commercial speech.[8]  *Id.* at 113–16.  The court

held that, because factual disclosure requirements do not ordinarily "offend the important

utilitarian and individual liberty interests that lie at the heart of the First Amendment[,]

[t]he Amendment is satisfied . . . by a rational connection between the purpose of a

commercial disclosure requirement and the means employed to realize that purpose."  *Id.*

at 114–15.  The court went on to find that, while the "overall" purpose of the disclosure

was to protect human health and the environment from mercury poisoning, this goal was

"inextricably intertwined with the goal of increasing consumer awareness of the presence

of mercury in a variety of products."  *Id.* at 115.  As such, though the statute was not

"intended to prevent 'consumer confusion or deception' per se," *id.* (quoting *Zauderer*,

471 U.S. at 651), its aims were not inconsistent with the rationale for providing First

Amendment protection to commercial speech—"[p]rotection of the robust and free flow

of accurate information."  *Id.* at 114–15**.**

---

[8]  The *Central Hudson* analysis requires a court to consider (1) whether the regulated expression concerns lawful activity and is not misleading; (2) whether the asserted governmental interest is substantial; (3) whether the regulation directly advances the governmental interest asserted; and (4) whether the regulation is more extensive than is necessary to advance that interest.  447 U.S. at 566.

The court found that the reasonable relationship between the Vermont statute and the state's interest in reducing mercury contamination was "plain" because it was probable that some purchasers of mercury-containing products would use the disclosed information to properly dispose of those products, thereby limiting mercury pollution. *Id.* at 115 ("By encouraging such changes in consumer behavior, the labeling requirement is rationally related to the state's goal of reducing mercury contamination.").

*Zauderer* and *Sorrell* supply the proper standard of review in this case. Like the requirement that a manufacturer disclose that its products contain mercury, Regulation 81.50 compels only the disclosure of "purely factual and uncontroversial" commercial information—the calorie content of restaurant menu items. Furthermore, both Regulation 81.50 and the Vermont statute at issue in *Sorrell* attempt to address a state policy interest by making information available to consumers, consistent with the First Amendment objective, with respect to commercial speech, of providing consumers with "complete and accurate commercial information." *Edenfield v. Fane*, 507 U.S. 761, 766 (1993). Therefore, Regulation 81.50 passes constitutional muster as long as there is a "rational connection" between the disclosure requirement and the City's purpose in imposing it. *See Sorrell*, 272 F.3d at 114–15.

NYSRA argues that *Zauderer* and *Sorrell* are inapplicable, and that Regulation 81.50 should be evaluated using the analysis developed for "compelled speech." (Pl.'s Mem. 28–33.) It is well established that the First Amendment generally does not allow the government to force a speaker to utter a message that is not its own, *see, e.g., Barnette*, 319 U.S. at 632–34 (holding that school board may not require students to salute flag and recite pledge of allegiance), or "to associate with speech with which it

may disagree," *see, e.g., Pac. Gas and Elec. Co. v. Pub. Utils. Comm'n of Cal.*, 475 U.S. 1, 15 (1986) (holding that state agency may not require utility to include third party newsletter in its billing envelopes).

The First Amendment's prohibition of compelled speech also restricts the government's ability to require an entity to subsidize a message with which it disagrees. For example, in *United Foods*, the Supreme Court struck down mandatory assessments against mushroom producers, imposed pursuant to a federal statute, where the assessments were primarily used to fund "generic advertising to promote mushroom sales." 533 U.S. at 408. The respondent, a mushroom producer subject to the governing statute, challenged the assessments on the grounds that the respondent disagreed with the advertisements promoting mushrooms generally, preferring to convey the message that its mushrooms were superior to those of its competitors. *Id.* at 410–11. As such, the assessments forced the respondent to subsidize a message to which it objected. *Id.* Relying upon *United Foods*, NYSRA claims that Regulation 81.50 compels its members to promote the government's messages "that patrons *must* consider the caloric content of food when ordering in a restaurant, and that calories are the only nutritional criterion that patrons need to consider." (Pl.'s Mem. 30 (emphasis in original).)

NYSRA's reliance on *United Foods* is misplaced. Regulation 81.50 does not force any NYSRA member to take a position in any ongoing debate. It does not require any statement, express or implied, regarding the relative nutritional importance of calories or whether a food purchaser ought to consider this information, nor does it prevent any NYSRA member from contesting the City's views on these issues. The City is simply requiring restaurants to report "factual and uncontroversial" information—the

number of calories in its products.  Of course, it would be possible to recast any disclosure requirement as a compelled "message" in support of the policy views that motivated the enactment of that requirement.  However, as discussed above, the mandatory disclosure of "factual and uncontroversial" information is not the same, for First Amendment purposes, as the compelled endorsement of a viewpoint.  *See, e.g., Zauderer*, 471 U.S. at 650 ("The interests at stake in this case are not of the same order as those discussed in *Wooley*, *Tornillo*, and *Barnette*."); *Sorrell*, 272 F.3d at 114 ("[T]he individual liberty interests guarded by the First Amendment, which may be impaired when personal or political speech is mandated by the state, are not ordinarily implicated by compelled commercial disclosure.") (citations omitted); *Hurley v. Irish-Am. Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557, 573 (1995) ("Although the State may at times 'prescribe what shall be orthodox in commercial advertising' by requiring the dissemination of 'purely factual and uncontroversial information,' outside that context it may not compel affirmance of a belief with which the speaker disagrees. . . ."); *Entm't Software Ass'n v. Blagojevich*, 469 F.3d 641, 651 (7th Cir. 2006) ("Particularly in the commercial arena, the Constitution permits the State to require messages without their consent, the most prominent examples being warning and nutritional information labels.").[9]  NYSRA's argument would eliminate this distinction entirely.

---

[9] NYSRA contends that *Entertainment Software* supports its position.  (Pl.'s Reply Mem. 23–24.) *Entertainment Software* addressed the constitutionality of an Illinois statute that required video game retailers to label "sexually explicit" video games with a four-inch square label with the numerals "18."  469 F.3d at 643, 651–53.  A "sexually explicit" video game was defined as a video game

> that the average person, applying contemporary community standards would find, with respect to minors, is designed to appeal or pander to the prurient interest and depict or represent in a manner patently offensive with respect to minors, an actual or simulated sexual act or sexual contact, an actual or simulated normal or perverted sexual act or lewd exhibition of the genitals or post-pubescent female breast.

NYSRA further argues that if Regulation 81.50 is not treated as "compelled speech" under *United Foods*, it should be analyzed under the four-part test set out in *Central Hudson*, a standard considerably more demanding than the "reasonable relationship" standard applied in *Zauderer* and *Sorrell* to commercial disclosure requirements. NYSRA seeks to justify increased scrutiny based on the "increasing recognition that commercial speech is of vital importance to First Amendment values." (Pl.'s Reply Mem. 20; *see also* Pl.'s Mem. 33–39.) While it is true that the Supreme Court has acknowledged the value of commercial speech and that some of the current Supreme Court Justices have questioned the differential treatment of commercial speech, none of the passages cited by NYSRA came from cases involving commercial disclosure requirements.[10] In any case, the Second Circuit made clear in *Sorrell* that *Central*

---

*Id.* at 643. The Seventh Circuit held that the labeling requirement impermissibly compelled speech, finding that it did not involve a "purely factual disclosure," but instead forced the retailer to communicate "a subjective and highly controversial message—that the game's content is sexually explicit." *Id.* at 652.

By contrast, Regulation 81.50 requires a purely factual disclosure—the verifiable calorie content of menu offerings. *Entertainment Software* expressly acknowledged that a state is permitted "to require speakers to express certain messages without their consent, the most prominent examples being warning and nutritional information labels." *Id.* at 651 (citing *Sorrell*). Indeed, the court specifically distinguished the Illinois statute from the disclosure requirement at issue in *Sorrell*, finding the statutory definition of "sexually explicit" to be "far more opinion-based than the question of whether a particular chemical is within any given product." *Id.* at 652.

[10] For example, NYSRA cites Justice Breyer's dissent from the Court's dismissal of the writ of certiorari in *Nike, Inc. v. Kasky*, 539 U.S. 654, 665, 676–78 (2003). (*See* Pl.'s Mem. 33–34 n.14.) In his dissent, Justice Breyer argued for heightened First Amendment scrutiny of a provision of California law that permitted a civil action for false advertising against the plaintiff shoe manufacturer for public statements regarding the labor conditions at its foreign production facilities, finding that these statements "concern[ed] a matter that is of significant public interest and active controversy" and were thus distinguishable from "regulations of purer forms of commercial speech, such as simple product advertisements." NYSRA also cites *United Foods*, which, as discussed above, does not involve a commercial disclosure requirement, and *Edenfield v. Fane*, 507 U.S. 761 (1993), which addressed a Florida Board of Accountancy rule that banned in-person solicitation by certified public accountants. (Pl.'s Reply Mem. 20–21.) Finally, at oral argument, NYSRA mentioned Justice Thomas's dissent in *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 518–28 (1996). In *Liquormart*, the Court found unconstitutional a Rhode Island statute that prohibited advertisement of retail prices of alcoholic beverages. 517 U.S. at 489. Justice Thomas concurred in the judgment but questioned the differential treatment of commercial speech "[i]n cases such as this, in which the government's asserted interest is to keep legal users of a product or service ignorant in order to manipulate their choices in the marketplace." *Id.* at 518. Thomas expressly limited his comments to regulations passed in furtherance of this asserted state interest, which he found to be "*per se* illegitimate." *Id.* at 523 &

*Hudson* is not applied to factual commercial disclosure requirements. *Sorrell*, 272 F.3d at 113–14. The court in *Sorrell* also explained that the use of the *Central Hudson* test in an earlier case involving a commercial disclosure requirement, *International Dairy Foods Association v. Amestoy*, 92 F.3d 67, 80 (2d Cir. 1996), was "expressly limited to cases in which a state disclosure requirement is supported by no interest other than the gratification of 'consumer curiosity.'" *Id.* at 115 n.6.[11]

NYSRA also claims that the *Zauderer* "reasonable relationship" standard is inapplicable to this case because *Zauderer* is limited to "laws necessary to prevent deception," emphasizing in particular the fact that *United Foods* distinguished *Zauderer* on the grounds that "there [was] no suggestion [in *United Foods*] . . . that the mandatory assessments imposed . . . are somehow necessary to make voluntary advertisements

---

n.5. Finally, NYSRA pointed to Justice Souter's dissent in *Glickman v. Wileman Brothers & Elliot, Inc.*, 521 U.S. 457 (1997), a case in which the Court upheld mandatory assessments on California fruit producers that were used to fund generic advertising. 521 U.S. at 460–77. Justice Souter characterized the First Amendment interest in commercial speech as including not only the consumer's interest in truthful information but also the advertiser's interest in economic gain and persuasion. *Id.* at 479. At the same time, he acknowledged that the value of "the rhetoric of advertising . . . may well be of a distinctly lower order than the importance of providing accurate factual information, and the inextricable linkage between advertising and [the] underlying commercial transaction 'may give [the government] a concomitant interest in the expression itself.'" *Id.* at 480 (quoting *Edenfield v. Fane*, 507 U.S. 761, 767 (1993)). NYSRA arguably finds some support in Justice Souter's statement that *Zauderer* does not stand for the proposition that "a regulation adding to public information is immune from scrutiny" and "carries no authority for a mandate unrelated to the interest in avoiding misleading or incomplete commercial messages." *See id.* at 490–91. However, as discussed below, Regulation 81.50 is related to the state's interest in providing consumers with more complete nutrient information concerning restaurant offerings.

[11] NYSRA maintains that *Sorrell* incorrectly applied *Zauderer* and that "disclosure regulations" are routinely examined under *Central Hudson*, citing *Whitaker v. Thompson*, 353 F.3d 947 (D.C. Cir. 2004), *Pearson v. Shalala*, 164 F.3d 650 (D.C. Cir. 1999), and *Nutritional Health Alliance v. Shalala*, 144 F.3d 220, 225 (2d Cir. 1998). Contrary to NYSRA's characterization, none of these cases involved a compelled disclosure requirement. *Whitaker v. Thompson* addressed the FDA's requirement that a product must be approved as a "drug" in order to be marketed with a label including claims regarding the use of the product to treat disease. *See* 353 F.3d at 948–49. Both *Pearson* and *Nutritional Health Alliance* addressed provisions of NLEA requiring manufacturers to receive authorization from the FDA before making "health claims" on the labels of dietary supplement products. *See Pearson*, 164 F.3d at 651–54; *Nutritional Health Alliance*, 144 F.3d at 223. In finding that the FDA's approval requirement for health claims did not satisfy *Central Hudson*, the D.C. Circuit in *Pearson* specifically noted that the Supreme Court's commercial speech jurisprudence has "repeatedly" indicated a preference for disclosure over suppression of information. 164 F.3d at 657–59.

nonmisleading for customers." (Pl.'s Mem. 41–43; Pl.'s Reply Mem. 19–20); *United Foods*, 533 U.S. at 416.

In *United Foods*, the assessments at issue were used in large part to pay for advertisements promoting mushroom sales generally. *United Foods*, 533 U.S. at 408. The speech at issue was not a factual disclosure intended to better inform consumers' purchasing choices, but advertising intended to persuade consumers to buy competitors' mushrooms. In *Zauderer*, the Court noted that "because disclosure requirements trench much more narrowly on an advertiser's interests than do flat prohibitions on speech, 'warning[s] or disclaimer[s] might be appropriately required . . . in order to dissipate the possibility of consumer confusion or deception,'" and proceeded to hold that "[First Amendment] rights are adequately protected as long as disclosure requirements are reasonably related to the State's interest in preventing deception of consumers." 471 U.S. at 651. Regardless whether the majority in *United Foods* interpreted *Zauderer* broadly, applying whenever the state interest is to provide accurate commercial information to consumers, or narrowly, applying only when the state interest is to amend an affirmatively deceptive advertisement, *Zauderer* is clearly inapplicable to the advertisements at issue in *United Foods*, which were presumably intended to benefit mushroom producers, not consumers. Therefore, by distinguishing *Zauderer*, *United Foods* did not expressly or implicitly limit its scope.

Furthermore, as noted above, the Second Circuit in *Sorrell* specifically rejected a narrow reading of *Zauderer*, upholding the required disclosure regarding mercury-containing products even though it was "not intended to prevent 'consumer confusion or deception' per se but rather to better inform consumers about the products they

purchase." *Sorrell*, 272 F.3d at 115.  The court explained that this purpose was consistent

with First Amendment policies regarding commercial speech.  *Id.  Sorrell* demonstrates

that the state's interest in preventing consumer "confusion" and "deception" is not limited

to an interest in correcting affirmatively misleading statements and may include an

interest in remedying consumers' ignorance or misinformation regarding the products

they purchase.  Similar to the Vermont statute at issue in *Sorrell*, which was found to be

"inextricably intertwined with the goal of increasing consumer awareness of the presence

of mercury in a variety of products," *id.*, Regulation 81.50 is "inextricably intertwined"

with the goal of increasing consumer awareness of the calorie content of restaurant meals.

The City cites evidence indicating that consumers tend to underestimate the calorie

content of restaurant meals, sometimes significantly.  (*See, e.g.,* Pl.'s App. Ex. L at 5–6;

Frieden Decl. ¶¶ 26–28, Ex. 8.)  At least with respect to large meals and food items,

NYSRA does not dispute this assertion.[12]  The City is attempting to combat obesity by

addressing this "information gap"—providing consumers with information about the

potential health impact of the products they purchase.  The City's method is entirely

consistent with First Amendment interests with respect to commercial speech, such as

"the discovery of truth," "the efficiency of the 'marketplace of ideas,'" and "[t]he

protection of the robust and free flow of accurate information."  *Sorrell*, 272 F.3d at 114;

*see also 44 Liquormart*, 517 U.S. at 501 ("When a State . . . requires the disclosure of

---

[12] NYSRA does not dispute this point at all in its briefs.  In his declaration in support of NYSRA's motion, Dr. David Allison concedes that people probably underestimate the caloric content of large meals and food items, while noting that the data may not account for the possibility that consumers intentionally misrepresent their beliefs about calorie content in order to preserve the perception that they are "reasonable" eaters.  (Allison Decl. 11.)

beneficial consumer information, the purpose of its regulation is consistent with the reasons for according constitutional protection to commercial speech . . . .").

NYSRA also attempts to distinguish *Sorrell* as a disclosure necessary "to implement a law that makes certain activity unlawful." (Pl.'s Mem. 40; Pl.'s Reply Mem. 23.) According to NYSRA, the mandatory disclosure regarding mercury-containing products in *Sorrell* had a "law-enforcement purpose" because Vermont had also passed a law prohibiting individuals from disposing of mercury-containing products with ordinary waste. (Pl.'s Mem. 40; Pl.'s Reply Mem. 23.) Without the mandatory disclosure, the law regarding disposal would have been "virtually meaningless," as consumers would have been unable to comply with it.[13] (Pl.'s Mem. 40; Pl.'s Reply Mem. 23.) NYSRA cites no case law indicating that a "law enforcement purpose" can cure an otherwise unconstitutional speech regulation.[14] Nothing in *Sorrell* indicates that

---

[13] It is unclear to what Vermont law regarding disposal NYSRA refers. The provision regarding disposal described in the *Sorrell* opinion only prohibited disposal of *labeled* mercury-containing products. *See Sorrell*, 272 F.3d at 107. Therefore, contrary to NYSRA's assertion, the disclosure requirement was not necessary "to help customers avoid breaking the law." (Pl.'s Reply Mem. 23.) Instead, the provision criminalizing disposal of mercury-containing products presupposed the existence of the disclosure requirement.

[14] NYSRA suggests that the regulation in *Sorrell*, because it was allegedly necessary to ensure fair enforcement of other legislation that criminalized improper disposal of mercury-containing products, can be justified under *United Foods* as a measure enacted in furtherance of a "comprehensive regulatory regime." (Pl.'s Mem. 40.) In *United Foods*, the Court compared the assessments at issue in that case to assessments considered in an earlier case, *Glickman v. Wileman Brothers & Elliot, Inc.*, 521 U.S. 457 (1997), in which the Court upheld the constitutionality of marketing orders requiring certain fruit producers to pay assessments for advertising. *United Foods*, 522 U.S. at 408, 411–16. The Court distinguished the assessments in *Glickman* as having been ancillary to a "more comprehensive program restricting marketing autonomy," *id.* at 411, while the *United Foods* assessments were part of no "broader regulatory system," *id.* at 415. In *Glickman*, the Court relied upon cases that held that assessments charged to members of an association compelled by law and used to fund ideological activities may be constitutional if "'germane' to the purpose for which compelled association was justified." *See, e.g., Glickman*, 521 U.S. at 473 (quoting *Keller v. State Bar of Cal.*, 496 U.S. 1, 13–14 (1990)). In *United Foods*, the Court pointed out that the "broader regulatory system" in place in *Glickman* had satisfied the Court's threshold inquiry into "whether there [was] some state imposed obligation which [made] group membership less than voluntary, for it is only the overriding associational purpose which allows any compelled subsidy for speech in the first place." *United Foods*, 522 U.S. at 413–16. Of course, *Sorrell* involved no compelled association of any kind and therefore no regulatory scheme of the type described in *United Foods*. *Id.* at 411–16. Neither *United Foods* nor *Glickman* indicates, as NYSRA apparently asserts, that the government is, as a general

its holding was based on any alleged "law enforcement purpose" of the regulation—the opinion explicitly relies on the fact that the Vermont statute was merely a commercial disclosure requirement, which does not ordinarily offend "core First Amendment values." *Sorrell*, at 113–14. This attempt to distinguish *Sorrell* is rejected.

### B. Regulation 81.50 is Reasonably Related to the City's Interest in Reducing Obesity

NYSRA does not specifically contend that Regulation 81.50 fails the "reasonable relationship"/"rational connection" test of *Zauderer* and *Sorrell*, but instead maintains that a different standard should be applied. However, in connection with its argument that Regulation 81.50 fails to satisfy the more stringent *Central Hudson* test, NYSRA does make the argument that the regulation does not directly advance the asserted government interest of reducing obesity, claiming that more research is needed on the relationship between calorie information and consumer behavior and that there is no evidence that Regulation 81.50 will be effective in lowering obesity rates.[15] (Pl.'s Mem. 34–37; Pl.'s Reply Mem. 26–27.)

The City submitted evidence indicating that weight gain results when calorie intake exceeds calorie expenditure (Frieden Decl. ¶¶ 16, 17; St-Onge Decl. ¶ 9), that the recent rise in obesity is in some part attributable to excess calorie intake (St-Onge Decl. ¶ 8), that even modest changes in calorie intake can affect weight (Frieden Decl. ¶¶ 18, 20), that record-keeping and self-monitoring of food and calorie intake are important components of weight-management programs (St-Onge Decl. ¶ 10), and that people tend

---

rule, permitted to regulate speech whenever necessary to effectuate any "comprehensive regulatory regime."

[15] NYSRA concedes that the City has a substantial interest in reducing obesity. (*See* Pl.'s Mem. 34; Pl.'s Reply Mem. 26.)

to underestimate the calorie content of restaurant foods (Schwartz Decl. ¶ 2; *see also* Frieden Decl. ¶¶ 26–28, Ex. 8; Pl.'s App. Ex. L at 5–6; Allison Decl. 10–11).  The City also cites evidence that many consumers report looking at calorie information on packaged foods and changing their purchasing habits based on this information.  (Frieden Decl. ¶ 31; Schwartz Decl. ¶ 6.)  The City further points out that, after the introduction of mandatory nutrition labeling on packaged foods, food manufacturers began to offer reformulated and "nutritionally improved" products—suggesting that consumer demand for such products is promoted by increased consumer awareness of the nutritional content of available food options.  (Duffey Decl. ¶ 15.)

Dr. David Allison submitted a declaration in support of NYSRA's motion in which he reviews the available evidence and concludes that there is not "competent and reliable evidence that providing restaurant patrons with calorie information on menu items will reduce individual or population levels of obesity."  (Allison Decl. 29–30.)[16] However, Dr. Allison concedes that, based on available evidence, "it is reasonable to conjecture that providing calorie information at the point of purchase in restaurants (especially in fast food restaurants) might be beneficial in reducing obesity levels." (Allison Decl. 14, 33.)

---

[16] Dr. Allison's critique of the evidence is based in part on the fact that the efficacy of Regulation 81.50 is not adequately supported by data from randomized controlled trials (RCTs) or observational epidemiologic studies.  (*See, e.g.,* Allison Decl. 5–9.)  Dr. Allison admits, however, that "for practical or ethical reasons, it is often impossible to conduct an RCT to address a particular question."  (*Id.* at 7.)  Furthermore, a paper co-authored by Dr. Allison states that "it would be extraordinarily difficult if not impossible to conduct" studies to test the efficacy of some proposed approaches to addressing the obesity problem because "[i]t is difficult to blind people to many of the things under study, randomization is often impractical, and running studies for a sufficiently large number of subjects may also be impractical."  (Schwartz Decl. ¶ 9.)  In addition, it is worth noting that some observational epidemiologic studies that could be designed to address the efficacy of point-of-sale calorie disclosure are not currently possible in light of the fact that few, if any, restaurants voluntarily disclose calorie information at the point of sale.

The Court agrees with Dr. Allison that one cannot conclude with scientific certainty from the available evidence that that a regulation of this type will ultimately be successful in combating obesity. But even if there are no data demonstrating conclusively that Regulation 81.50 will be effective, conclusive proof is not required to establish a reasonable relationship between Regulation 81.50 and the City's interest in reducing obesity. Based on the evidence presented by the City, as well as common sense, it seems reasonable to expect that some consumers will use the information disclosed pursuant to Regulation 81.50 to select lower calorie meals when eating at covered restaurants and that these choices will lead to a lower incidence of obesity. *See Zauderer*, 471 U.S. at 652–53 (finding Ohio's required disclosure of client's liability for costs in attorney advertising for contingent-fee based services "easily passe[d] muster" under "reasonably related" standard and declining to require state to provide a survey demonstrating the "self-evident" potential for deception from such advertising based on Court's determination that it was "a commonplace that members of the public are often unaware of the technical meaning of such terms as 'fees' and 'costs'"); *Sorrell*, 272 F.3d at 115 (finding labeling requirement "rationally related" to Vermont's goal of reducing mercury contamination based on court's assessment that "[i]t is probable that some mercury lamp purchasers, newly informed by the Vermont label, will properly dispose of them and thereby reduce mercury pollution.").

NYSRA also points out that Regulation 81.50 does not affect the majority of restaurants or restaurant meals in the city, citing the City's estimation that the regulation would affect approximately one-tenth of the restaurants and one-third of the restaurant

meals purchased in the city.[17] (Pl.'s Mem. 37.) However, a regulation may still be reasonably related to the goal it is intended to promote even if "it does not get at all facets of the problem it is designed to ameliorate." *Sorrell*, 272 F.3d at 116 (quoting *Zauderer*, 471 U.S. at 652 n.14). "As a general matter, governments are entitled to attack problems piecemeal. . . ." *Zauderer*, 471 U.S. at 652 n.14. Regulation 81.50 is an entirely reasonable approach to the City's goal of reducing obesity.

## CONCLUSION

For the reasons stated herein, NYSRA has failed to show a likelihood of success on its preemption and First Amendment claims. NYSRA's motion for a preliminary injunction is therefore denied.

Because the Court has found that Regulation 81.50 is not preempted by NLEA, NYSRA's motions for declaratory relief and for summary judgment on the preemption claim are denied. The City's cross-motion for summary judgment on the preemption claim is granted.

SO ORDERED.

Dated: New York, New York
April 16, 2008

Richard J. Holwell
United States District Judge

---

[17] The statement of Basis and Purpose for Regulation 81.50 states that covered restaurants comprise approximately 10 percent of restaurants in New York City, but almost 35 percent of restaurant meals. (Pl.'s App. Ex. L at 10.) The City estimated the regulation would affect at least 145 million meals in New York City per year, and possibly many more. (*Id.*)

27